Frederick Smith Enterprise Company v. Commissioner.
Frederick Smith Enterprise Co. v. Commissioner
Docket No. 11158.
United States Tax Court
1947 Tax Ct. Memo LEXIS 190; 6 T.C.M. (CCH) 594; T.C.M. (RIA) 47148; June 4, 1947
Longstreet Heiskell, Esq., 711 First National Bank Bldg., Memphis, Tenn., for the petitioner. Frank M. Thompson, Jr., Esq., and S. Earl Heilman, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies in personal holding company surtax and penalties for failure to file personal holding *192 company tax returns for the years 1937, 1939, and 1940 in the following amounts: Year
Tax Deficiency
Penalty
1937
$19,849.05
$4,962.26
1939
22,695.76
5,673.94
1940
26,667.70
6,666.93
Petitioner having conceded the stock ownership requirement, the principal issue is whether it meets the gross income requirement in any or all of the years involved so as thereby to fall within the statutory definition of a personal holding company. If petitioner is found to be subject to the personal holding company surtax, an additional question arises whether petitioner is liable for the 25 percent penalty for failure to file any personal holding company tax returns. If petitioner is found to be a personal holding company during the year 1940, a question is presented whether it is entitled to a dividends-paid credit under Internal Revenue Code, section 504 (c), where it declared a dividend on March 3, 1941, but the checks in payment thereof were dated and delivered, and book entries made on or after March 26, 1941. Many of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, *193 a Delaware corporation, was incorporated on August 24, 1935, with its principal place of business in Memphis, Tennessee. It filed its income and excess-profits tax returns for the years in question with the collector for the district of Tennessee. It kept its books and filed its tax returns on an accrual and calendar year basis of accounting. The purposes for which it was incorporated included the purchase and sale of real estate. On its tax returns in answer to the question - "Kind of business" - the answer given was "Real Estate Development and Investments." Frederick Smith, petitioner's president, his brother, and his sister owned more than 50 percent of petitioner's stock at all times material to this proceeding. Facts With Reference to 1937: Among the real property held by petitioner in 1937 was the Matagorda Plantation, situated in Coahoma County, Mississippi, which it acquired in 1935. Prior arrangements for its acquisition had been undertaken by Smith, petitioner's president, and A. D. Moss, a resident of the county. The latter had entered into a contract to purchase the property which Smith had been instrumental in securing for him. Shortly after the acquisition *194 of the property petitioner leased the plantation to a partnership composed of Smith and Moss, which was formed on September 23, 1935, for the purpose of operating the plantation. The partnership was dissolved on August 1, 1937, the agreement of dissolution providing in part as follows: "* * * in consideration of the cancellation by Frederick Smith of that indebtedness of $9712.50 due by A. D. Moss, the said A. D. Moss hereby expressly agrees to and does surrender and transfer to said Frederick Smith all his right, title and interest in any and all property and assets of such partnership of Smith & Moss; * * *
"* * * A. B. Moss, in consideration of the cancellation of the above mentioned indebtedness, hereby sells, conveys and transfers to Frederick Smith all his right, title and interest in and to all property and assets of any nature, tangible or intangible, which may be owned or held by such partnership of Smith and Moss." Petitioner's gross income for the year 1937 included the following types and amounts of income: Dividends
$28,008.87
Interest
1,437.32
Profit from the sale of
stocks and bonds
$12,676.97
Less: Loss on cotton
contracts
1,312.00
11,364.97
Rents
45,040.24
Total
$85,851.40
*195 Included in the item "Rents" is the amount of $14,229.12 received by petitioner as rent for Matagorda Plantation, which was reflected in the following book entry: Journal Entry 36 - December 31, 1937
Dr. Rent - Smith & Moss
$13,001.69
Dr. Rent - U.S. Government
1,227.43
Cr. to Profit and Loss
$14,229.12 The amount of $13,000 was a fair and reasonable rental for the Plantation in 1937. On its 1937 tax return (Form 1120) petitioner claimed as a deduction, among others, in arriving at its net rental income, expenses, and depreciation on the Matagorda Plantation in the amount of $12,297.52. Facts With Reference to 1939: Petitioner's gross income for the year 1939 included the following types and amounts of income: Dividends received
$ 8,868.30
Interest earned
1,112.49
Profits on sales of stocks and bonds
2,406.55
Profits on cotton futures contracts
7,585.00
Realized profit on sale of plantation
8,455.94
Rents
50,504.77
$78,933.05
Of the item"Rents" the sum of $15,000, which was a reasonable amount therefor, was rent for the Matagorda Plantation, which was leased by petitioner to Smith for the year 1939. In arriving at its net *196 rental for 1939 of the Matagorda Plantation, petitioner deducted on its 1939 tax return as allowable expenses and depreciation in connection with its ownership of the property, the sum of $9,548.08. The item "Realized profit on sale of plantation, $8,455.94" is the profit contained in the cash payment received in 1939 from the sale of real estate owned by petitioner and known as Dodd Plantation. The entire profit from this sale, which was made in 1939 to Hudson Kyle, was $35,327.04. Of this entire profit the sum of $8,455.94 was reported as taxable income in 1939 and the balance of $26,871.10 was deferred as income on the installment basis. The amount of $8,455.94 is 23.93617 percent of the entire gain or profit. The sales price of the property was $94,000; the total cash received in 1939 was $22,500. Facts With Reference to the Year 1940: Petitioner's gross income for the year 1940 included the following types and amounts of income: Interest
$ 3,855.10
Rents
47,445.69
Gain from sale of stocks
3,081.43
Gain from sale of real estate
253.54
Dividends
15,347.07
$69,982.83
Of the item"Interest," the sum of $3,460.65 was interest received on a debt *197 owed to petitioner by Kyle, representing the balance of the purchase price for which the Dodd Plantation was sold by petitioner. Of the item "Rents," the sum of $15,000, which was a reasonable amount therefor, was rent for the Matagorda Plantation, which petitioner leased to Smith for the year 1940. Petitioner claimed on its tax return expenses and depreciation incident to its ownership of the plantation in the amount of $9,021.37. The item "Gain from sale of real estate" is the proportion of the installment profit on the sale of Dodd Plantation actually received in 1940. From the date of incorporation in 1935 to 1946 petitioner had made eight sales or exchanges of real property, as follows: Date of
Date of
Method of
Acquisition
Description
Disposition
Disposition
Sept. 21, 1935
Dodd Plantation
Nov. 1, 1939
Sale
Nov. 30, 1937
2 separate parcels designated as "Union and
Lauderdale" property
Nov. 30, 1945
(2nd parcel)
Sale
July 15, 1939
195 Union Avenue
Sept. 11, 1941
Sale
Aug. 5, 1940
199 Union Avenue
Sept. 11, 1941
Sale
Aug. 5, 1940
88-92 Hernando, all located in Memphis, Tenn.
Sept. 11, 1941
Sale
Sept. 6, 1939
Greenacres, Shelby County, Tenn.
Aug. 5, 1940
Exchange
Sept. 6, 1939
6 acres adjoining Greenacres
Mar. 3, 1941
Sale
May 2, 1940
537 E. Parkway South, Memphis, Tenn.
Jan. 24, 1942
Sale
Jan. 24, 1942
Lots on North Cleveland St., Memphis, Tenn.
Apr. 4, 1942
Exchange
Nov. 23, 1944
Madison and Dunlap Sts., Memphis, Tenn.
Sept. 30, 1945
Sale
*198 Of petitioner's gross income for the years 1937, 1939, and 1940, $8,709.48 was derived from the one sale of real estate made during those years, that of the Dodd Plantation. The interest payment received from Kyle was not interest on a debt representing the price for which real property held primarily for sale to customers in petitioner's ordinary course of trade or business was sold. In 1940 petitioner was a stockholder of the National Toddle House Corporation(hereinafter referred to as Toddle House), of which Smith was also president, which declared a dividend on December 9, 1940. Pursuant to resolution, the dividend was payable December 31, 1940. Of the declared dividend of $25,000, petitioner's share was $8,250, which it entered on its books in 1940, and reported as income, in addition to the $15,347.07 heretofore mentioned, on its 1940 tax return. Of the dividend of $25,000, the sum of $6,500 was paid to 12 stockholders, of which petitioner was not one, in 1940. Toddle House did not have sufficient ready cash to pay all stockholders in 1940; payment was made in full to two or three stockholders who so requested, and to a few others who held small blocks of stock. After *199 these payments Toddle House had slightly over $7,000 in cash in the bank. On or about January 10, 1941, petitioner received a check covering its dividend, which it deposited shortly thereafter. All checks were dated December 28, 1940. Petitioner declared a dividend in the amount of $20,000 on March 3, 1941, which pursuant to resolution, was to "be paid * * * as soon as checks * * * can conveniently be made up and issued." Checks in payment thereof were dated March 26, 1941, and were delivered on or after that date. Debits were made on petitioner's books under the date of March 26, 1941. Of the $20,000 dividend, $19,992 was repaid to petitioner, by the stockholders' endorsing their checks back to petitioner. The amounts repaid were credits against amounts owed topetitioner by the various stockholders. Penalty Issue: Petitioner filed no personal holding company tax returns (Form 1120H) for any of the years involved. In not filing these returns it relied upon the advice of J. W. Simpson, now deceased, a reputable accountant and tax consultant in the employ of the accounting firm which kept petitioner's books and prepared its tax returns. The matter of filing such returns *200 was the subject of discussion between Smith and Simpson on two or three occasions during the years here in question. Petitioner's tax returns and books and records for each of the years were studied and examined by respondent's office, a different revenue agent performing the function for each of the years. After these examinations deficiencies or overassessments were suggested by the examining agent and were accepted by petitioner. No reference to the liability for a personal holding company surtax was made in the reports. On February 2, 1944, the revenue agent in charge, Nashville Division, addressed a letter to petitioner, asserting for the first time that it was a personal holding company for the year 1940. In February, 1945, petitioner was apprised by respondent that it was considered a personal holding company for each of the years 1937 and 1939. In a statement attached to the deficiency notice, respondent determined: "It is held that during the year 1937 you were a personal holding company as defined by Section 352 of the Revenue Act of 1936, as amended, and therefore liable for the personal holding company surtax imposed by Section 351 of such Act. "It is held that *201 during the years 1939 and 1940 you were a personal holding company as defined by Section 501 of the Internal Revenue Code, and therefore liable for the personal holding company surtax imposed by Section 500 of the said Code. "Inasmuch as you failed to file personal holding company returns for the years 1937, 1939 and 1940, your surtax liability for each year has been increased by 25 per centum under the authority of Section 291 of the Revenue Act of 1936 and of the Internal Revenue Code." For each of the years involved petitioner was a personal holding company. Petitioner did not pay the dividend declared on March 3, 1941, before the 15th day of the third month following the close of the taxable year. Petitioner's failure to file personal holding company tax returns during any of the years involved was due to reasonable cause. Opinion The distribution of stock ownership in petitioner under the holding company definition having been conceded, the dispute as to all the years puts in controversy petitioner's liability as a personal holding company by reason of the existence of the requisite portion of holding company income as that is defined. [1] An *202 issue as to each year is whether the reasonableness of the rent charged by petitioner to a stockholder owning more than 25 percent of its stock [2] includes that item as "rent" and raises the total rent figure to more than 50 percent of the gross income, thus eliminating all of the rent from the holding company classification.[3] We are not able to see that the treatment accorded the rent received from a stockholder either by the statute itself or in its legislative history [4] can justify limitation to cases of excessive or inadequate payments. The possibilities of manipulation between controlled corporations and their stockholders upon which the attention of Congress was concentrated are too broad in scope for us to say, at least without a more conclusive demonstration, that the purpose of the section would be entirely secured by confining its application to unreasonable rentals. See Furniture Finance Corp., 46 B.T.A. 240; Olean Times Publishing Co., 42 B.T.A. 1277. *203 For the year 1937 a further contention in the same field is urged. During part of that year the property was occupied by a partnership composed of the same stockholder and an outsider. Without having to determine whether the mere existence of such a relationship would eliminate the stockholder as a participant, see Furniture Finance Corp., supra, cf. Minnesota Mortuaries, Inc., 4 T.C. 280, it is sufficient to note here that the partnership was dissolved and the property taken over solely by the stockholder as of August 1. Viewing the rental received from the stockholder as only 5/12ths of the total, enough will remain as a diminution of the rent item to reduce it below 50 percent of the gross income, and hence to constitute it holding company income. On these issues, respondent is sustained. For the year 1939, the additional question is whether petitioner's profit on an installment sale of real property made in that year may be included in full in its gross income for purposes of applying the holding company definition even though it elected to report only the proportionate part permitted by section 44, Internal Revenue Code. [5] *204 Petitioner is a personal holding company under section 501 (a) (1) if "at least [70] per centum of its gross income * * * is personal holding company income as defined in section 502." [6] It appears to be conceded, first, that if petitioner was a personal holding company for 1937, which we think it was, the requisite percentage is 70; and second, that profits on real property sales being excluded from personal holding company income, petitioner would fall below that percentage if the entire profit from the sale were to be included in its gross income for the year in issue. *205 Section 507 (a) provides: "* * * The terms used in this subchapter shall have the same meaning as when used in chapter 1." In Chapter 1, section 22, the term "gross income" is defined as including "income derived from * * * sales or dealings in property whether real or personal * * *." And section 44 permits "a person who * * * disposes of * * * property on the installment plan" to "return as income therefrom in any taxable year" only the designated proportion of the "gross profit." We think it follows from the combination of these provisions that the term "gross income" in section 22 and hence in the holding company subchapter includes for any year only that part of the gross profit required by chapter 1 to be included in gross income, see Emma B. Maloy, 45 B.T.A. 1104; and hence that petitioner was in receipt of an insufficient proportion of non-personal holding company income to remove it from that classification. Cases [7] involving the effect of gains on installment sales upon a corporation's earnings and profits are not decisive of the present question. It has long been recognized that the computation of earned surplus in an examination of the source of corporate *206 distributions does not "correspond exactly to taxable income, [and] does not necessarily follow corporate accounting concepts, either." Commissioner v. Wheeler, 324 U.S. 542. Familiar examples are the treatment of capital losses, I.T. 3253, 1939-1 C.B., 178, and of tax-exempt interest, see R. M. Weyerhaeuser, 33 B.T.A. 594, 597. But here we are dealing with a statutory provision which involves the term "gross income," and refers for its definition to the section defining the same words for income tax purposes. It seems to us to follow that unlike the cases which analyze corporate earnings, the personal holding company sections necessarily require that comparable concepts to those of income tax accounting be employed. On this issue respondent is sustained. For the year 1940 petitioner makes two adjustments to its income; concludes that the rental item was understated; that dividends were overstated; and that the rent accordingly comes to exceed 50 *207 per cent of its gross income and being thereby excluded as holding company income reduces the ratio of the latter to the gross income below the decisive percentage. In order to prevail, petitioner must succeed on both adjustments. The item of rent is sought to be enlarged by adding interest received on a purchase money mortgage of property sold in a prior year. This is said to be justified by section 502 (g), Internal Revenue Code. [8] It will be apparent that this interest can be included among the rents only if the property in question was "held primarily for sale to customers in the ordinary course of [petitioner's] trade or business." This language is identical with that appearing in other connections, and has been the subject of construction with sufficient uniformity so that we may now accept as a test the degree of frequency and continuity with which such sales have been characterized. Ehrman v. Commissioner (C.C.A., 9th Cir.), 120 Fed. (2d) 607, certiorari denied, 314 U.S. 668; 512 W. 56th Street Corporation v. Commissioner (C.C.A., 2nd Cir.), 151 Fed. (2d) 942; see Julius Goodman, 40 B.T.A. 22, 25. *208 In this case the record shows that through the year in question, and including the more than five years since petitioner's incorporation but two properties had been disposed of, only one of them by sale. That one was the property with which we are here concerned. For the years before us, on the other hand, rent appears uniformly to be the largest single item. It is hence impossible to escape the conclusion that petitioner's dealings in real property in the ordinary course of its business took the form of preservation and retention for the receipt of investment income, rather than the pursuit of profit from the purchase *209 and sale of property. Difficult as it would be to agree that this was property held primarily for sale, it is impossible to reach the conclusion that any such activity would have been in the regular course of petitioner's business. That this conforms to the legislative purpose becomes manifest when we note that the provision was adopted for the benefit of "operating companies whose principal business consists in the development of real estate for sale." H.R. 1860, 75th Cong., 3rd Sess., p. 51; 1939-1 (Pt. 2) C.B./ 765. It follows that the interest cannot be treated as rent under section 502 (g). The resulting disposition of this aspect of the issue in respondent's favor makes it unnecessary to consider petitioner's further adjustment involving the elimination of a dividend not actually received until the following year. See, however, Putnam's Estate v. Commissioner, 324 U.S. 393; cf. Commissioner v. American Light & Traction Co. ( C.C.A., 7th Cir.), 156 Fed. (2d) 398; see A. D. Saenger, Inc., 33 B.T.A. 135; affirmed (C.C.A., 5th Cir.), 84 Fed. (2d) 23, certiorari denied, 299 U.S. 577. Two other issues remain. The *210 first is whether a dividend declared early in March, 1941, but not paid until the 26th of that month, can be availed of as a dividends-paid credit for 1940 under the provisions of section 504 (c), Internal Revenue Code. [9] It being evident that the amounts in question were not "paid," within the time required, the deduction must be disallowed. Anthony U. Miller, Inc., 7 T.C. 729. Even though such payments could have been offset against debts owed by the stockholder and assuming that the mere operation of entering the appropriate figures on the books would have accomplished a "payment," a point we find it unnecessary to decide, the fact remains that no action even of this character was taken within the permitted interval. Petitioner was not in our view entitled to a dividends-paid credit for the prior year. *211 Respondent determined against petitioner the 25 percent penalty for failure to file personal holding company returns for all the years in question. This action is unjustified only if we are satisfied that there was reasonable cause for petitioner's omission. "Advice of reputable counsel that a taxpayer was not liable for the tax has been held to constitute reasonable cause for failure to file a return on time when it was accompanied by other circumstances showing the taxpayer's good faith." Safety Tube Corporation, 8 T.C. 757 (April 2, 1947). Instances of the latter apparently found sufficient in other cases are the novelty of the legislative provision, Agricultural Securities Corp., 39 B.T.A. 1103, affirmed (C.C.A., 9th Cir.), 116 Fed. (2d) 800; the doubtful character or difficulty of ascertainment of petitioner's liability, Safety Tube Corporation, supra; cf. Tarbox Corp., 6 T.C. 35; and failure of the respondent's subordinates to give notification of a potential liability after extensive examination of the corporate records. Hugh Smith, Inc., 8 T.C. 660 (Mar. 28, 1947). Considering the complications *212 involved and the period covered, we are inclined to the view that the penalties should not be enforced. On this issue respondent's determination is disapproved. The appeal to the Tax Court to exercise a supposed "equitable" power to protect the petitioner from the short statute of limitations incorporated in section 506 (j) and its own improvidence in failing to safeguard itself is one to which with the best will in the world we are without the authority to accede. Commissioner v. Gooch Milling and Elevator Co., 320 U.S. 418; C. D. Little, 20 B.T.A. 1042. Decision will be entered under Rule 50. Footnotes
1. Revenue Act of 1937, section 1, amending Revenue Act of 1936, section 353; Internal Revenue Code, section 502↩. 2. Revenue Act of 1937, section 1: * * *
"SEC. 353. * * * "(f) Use of Corporation Property by Shareholder. - Amounts received as compensation (however designated and from whomsoever received) for the use of, or right to use, property of the corporation in any case where, at any time during the taxable year, 25 per centum or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for an individual entitled to the use of the property; whether such right is obtained directly from the corporation or by means of a sublease or other arrangement." See also Internal Revenue Code, section 502(f)↩. 3. Revenue Act of 1937, section 1: * * *
"SEC. 353. * * * "(g) Rents. - Rents, unless constituting 50 per centum or more of the gross income. For the purposes of this subsection the term 'rents' means compensation, however designated, for the use of, or right to use, property; but does not include amounts constituting personal holding company income under subsection (f)." See also Internal Revenue Code, section 502(g)↩. 4. H. Rep. 1546 (75th Cong., 1st Sess.), p. 6.↩
5. "SEC. 44. INSTALLMENT BASIS. "(a) Dealers in Personal Property. - Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price. "(b) Sales of Realty and Casual Sales of Personality. - In the case * * * (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price * * * the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. * * *" ↩
6. Internal Revenue Code, section 501(a)(1): "SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY. "(a) General Rule. - For the purposes of this subchapter and chapter 1, the term 'personal holding company' means any corporation if - "(1) Gross Income Requirement. - At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502↩; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income * * *"
7. Commissioner v. Shenandoah Company (C.C.A., 5th Cir.), 138 Fed. (2d) 792; Kimbrell's Home Furnishings, Inc. v. Commissioner (C.C.A., 4th Cir.), 159 Fed. (2d) 608↩.
8. "(g) Rents. - Rents, unless constituting 50 per centum or more of the gross income. For the purposes of this subsection the term 'rents' means compensation, however designated, for the use of, or right to use, property, and the interest on debts owed to the corporation, to the extent such debts represent the price for which real property held primarily for sale to customers in the ordinary course of its trade or business was sold or exchanged by the corporation; but does not include amounts constituting personal holding company income under subsection (f)."↩
9. "(c) Dividends paid after the close of the taxable year and before the 15th day of the third month following the close of the taxable year, if claimed under this subsection in the return, but only to the extent to which such dividends would have been includible in the computation of the basic surtax credit for the taxable year if distributed during such taxable year; * * *"↩