**UNITED STATES v. CUMMINS DISTIL-LERIES CORPORATION et al.**

No. 10527.

Circuit Court of Appeals, Sixth Circuit.

Feb. 6, 1948.

ALLEN, Circuit Judge, dissenting.

———◆———

Homer R. Miller, of Washington, D. C. (Theron L. Caudle, Sewall Key, George A. Stinson and Homer R. Miller, all of Washington, D. C., and David C. Walls and A. Roy Copeland, both of Louisville, Ky., on the brief), for appellant.

J. Verser Conner, of Louisville, Ky. (Allen P. Dodd, Irvin Marcus, J. Verser Conner, A. C. Van Winkle and John K. Skaggs, Jr., all of Louisville, Ky., and Frederic P. Lee, of Washington, D. C., on the brief), for appellees.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

The principal question in the case is whether whiskey warehouse receipts assigned to stockholders of the appellees in pursuance of a plan of liquidation and sold by a stockholders' committee was in effect a sale by the corporation. If so, the corporation made a profit and was liable for taxes in stipulated amount to the United States, for the collection of which it had made a levy and filed a lien upon funds deposited with the Louisville Trust Company for distribution to stockholders. There is little or no dispute as to evidentiary facts, accepted by the appellant as found by the District Judge.

The suit below was begun by the Louisville Trust Company for a declaration of rights in the deposit because of a jeopardy assessment of income taxes against the Distilleries Corporation, followed by distraint. The defendants were the Collector of Internal Revenue for Kentucky, the Corporation, members of the Stockholders' Committee, sundry creditors, and selected stockholders as representatives of their class. The United States intervened, claiming a first and prior lien for delinquent income taxes of more than 2¼ million dollars. The court, by its original and substituted judgment, dismissed the claim of the appellant, set aside its lien, and directed the Trust Company to retain the fund and refrain from distributing it until its further order, the cause to remain upon the docket for such further proceedings as may be proper.

Cummins Distilleries Corporation was incorporated in 1933 under the laws of Delaware. In 1942, it had outstanding preferred stock upon which there was an accumulated unpaid dividend. Factional differences existed among the directors and receivership proceedings were threatened, both by common and preferred stockholders. It had also become known that the government, as part of its war program, would direct the distillation of beverage alcohol to be discontinued. Because of these conditions, the directors considered liquidation of the corporation in August, though no decision was arrived at until November 30, 1942, when a recommendation was made to stockholders that the corporation be liquidated and dissolved, and a stockholders' meeting called for December 21, 1942, to consider the recommendation. At that meeting the stockholders authorized dissolution and complete liquidation of the corporation. They adopted a plan calling for payment of preferred stockholders in cash, for payment of the company's obligations, and for distribution of assets to common stockholders, either in kind or in cash. On the same day, the directors instructed the executive officers to set aside certain assets of the corporation for the payment of preferred stockholders and settlement of its debts, and then adopted a resolution which provided for dissolution and liquidation to be made to owners of common stock out of the net equity of the company in warehouse receipts representing 51,694 barrels of whiskey. A bid for the distillery and other assets was accepted, and the officers were authorized to convey this property to the purchaser. The conveyance was made as directed and provision was made for payment of preferred stockholders and all known debts and taxes.

On December 25, some of the larger stockholders discussed the advisability of appointing a committee which could act for them in distributing to each stockholder the portion of the warehouse receipts to which he was entitled. The receipts had been pledged to various banks to secure a corporate indebtedness of approximately $1,113,000, and a practical problem was involved in converting the equity into cash. The stockholders agreed upon a committee of three, and an instrument was drawn authorizing it to receive from the company evidence of title to assets theretofore transferred to the stockholders in kind, to sell such assets, and to distribute the proceeds to the holders of the corporate stock. This document was circulated among the stockholders and signed by owners of 80% of the stock, who also executed an instrument authorizing the corporation to deliver to the committee the warehouse receipts to which they were entitled. They also executed a third document addressed to the corporation, reciting that it would be for the best

interests of all that the committee should likewise act for the remaining 20% of the stockholders and requested the corporation to deliver to the committee their warehouse receipts, undertaking to protect and indemnify the company, its directors and officers, against any claims arising out of such assignment and delivery and to release the corporation from its bank indebtedness. On December 28, the corporation executed two assignments, by one of which it transferred its equity in 80% of the warehouse receipts to the stockholders who had appointed the committee, and by the other transferred to them its equity in the remaining 20% of the warehouse receipts.

The corporation had, in the meantime, caused its indebtedness to various banks to be consolidated in one loan from the Continental Illinois National Bank and Trust Company of Chicago, which thereby acquired possession of all the warehouse receipts as security. On December 29, 1942, the corporation issued and delivered to the committee substituted warehouse receipts which were to be validated and substituted for the original certificates, upon the committee securing the release of the corporation from its indebtedness to the Chicago bank. The committee immediately went to Chicago, executed its own note for the indebtedness owing to the Continental Bank, and caused the substituted warehouse receipts to be validated and pledged to the bank. The corporation's note and the original warehouse receipts were thereupon canceled. Immediately thereafter the committee met with L. A. Weiss, a whiskey broker, in his office in Chicago, who advised them of a news item to the effect that a ceiling price on sales of warehouse receipts would probably be imposed in the near future which would be less than the market price. The committee then decided upon an immediate sale, and authorized Weiss to sell the warehouse receipts at prices then fixed. Prior to that time, Weiss had negotiated neither for the sale of whiskey nor warehouse receipts for the company or the committee, although the corporation at some time prior thereto had indicated in a general way that it would possibly sell the whiskey at a later time, without definite date, purchasers, or sales prices being mentioned. Weiss had not previously been employed by the committee nor been given authority to act until he was authorized to do so on December 30. Following such authorization, Weiss immediately negotiated with possible purchasers by long distance telephone and obtained commitments covering all the warehouse receipts, with allocation of quantities to be later determined. On January 4, 1943, members of the committee again went to Chicago, closed the sales in pursuance of the commitments and allocations, delivered the receipts, and received payment of the purchase price. The proceeds were deposited in the Continental Bank to the credit of the committee, which then paid off its note to the bank, and later transferred $3,000,000 to the account of the committee at the Louisville Trust Company, in Louisville, Kentucky. In the meanwhile the State of Delaware had on December 31, 1942, issued its certificate dissolving the Cummins Distilleries Corporation.

On January 20, 1943, the committee employed the Louisville Trust Company as its agent to distribute the fund to the stockholders of the corporation. On January 21, it mailed to each stockholder a report of its action, stating the amount of distribution per share upon presentation of stock certificates duly endorsed. On the same day, the Trust Company mailed to each common stockholder a letter likewise advising of the proposed payment and calling upon stockholders to deliver their stock certificates properly endorsed for surrender and cancelation. By January 26, 1943, out of the total of 219,207 shares, 197,289 shares had been delivered or mailed to the Trust Company. Checks were issued and subsequently paid by the Trust Company on 148,110 shares. Distribution was halted, and the fund frozen when on January 26 the Collector made his jeopardy assessment on the theory that the sales of the warehouse receipts were made by the corporation and not by the stockholders. He levied on all the funds to the credit of the committee in the Trust Company, upon funds of the corporation, set aside for retiring its preferred stock and for the payment of its outstanding mortgage indebtedness and upon its general deposit accounts.

The Court concluded that the sale of the warehouse receipts was on behalf of the stockholders individually and not chargeable to the corporation. It found little, if any, direct evidence that the committee had carried out any contract previously negotiated by the corporation. It concluded upon unequivocal and uncontroverted testimony that the committee had no intention of selling the warehouse receipts when it went to Chicago to obtain possession of them from the bank and that no agreement with Weiss to sell them had previously been negotiated. It found it undisputed that purchasers, price and allocations were agreed upon only after the committee had acquired possession of the receipts.

 If the Court's conclusions be viewed as findings of ultimate facts, they are binding upon us under Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, if not clearly erroneous. We are unable so to consider them and decision must be affirmed, unless out of the circumstances pressed upon us by the appellant a question of law emerges in the decision of which the Court fell into error. The appellant would have us set aside the judgment upon grounds which include the fact that the corporation had previously considered selling the whiskey receipts at some indefinite future time, that the stockholders who had appointed the committee included some of the larger and more important stockholders, that the committee consisted of Morrison, a vice president and treasurer of the corporation, Waldman, its accountant, and Wagner, a member of a brokerage firm, which had distributed the company's stock, that the warehouse receipts had fixed value in a firm market, and that the stockholders' committee had not been authorized to receive or sell the receipts to which a minority of the stockholders were entitled. This leads to a consideration of the legal principles involved.

 It has been held from an early date that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes or altogether avoid them by means which the law permits. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728. The principle was reaffirmed in Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, was recently restated in Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135, and has been applied in numerous Circuit Court of Appeals cases. As was said by this court speaking through Judge Hickenlooper in Marshall v. Commissioner, 57 F.2d 633, 634: "There was nothing unlawful, or even mildly unethical, in the motive of petitioner, to avoid some portion of the burden of taxation".[1] If this doctrine is now to be rejected because of the needs of the Treasury or for other reasons, it may not be inappropriate to say that its rejection must be directed by the Congress or ultimate judicial authority. Otherwise it must be applied.

 From the circumstances relied upon by the appellant, it may perhaps be assumed that the manner of the company's liquidation was motivated by a purpose to avoid taxation. This we need not decide, for granted such purpose, it alone is not enough to sustain the government's claim. As was said by Judge Learned Hand in Chisholm v. Commissioner of Internal Revenue, 2 Cir., 79 F.2d 14, 15, 101 A.L.R. 200: "The question always is whether the transaction under scrutiny is in fact what it appears to be in form * * * the purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation * * *." So when in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, a corporation was organized with a purpose merely to draft papers rather than one to create an active corporate entity, the

---

[1] In Founders General Co. v. Hoey, 300 U.S. 268, 57 S.Ct. 457, 460, 81 L.Ed. 639, it was suggested that the taxpayer might have attained his ultimate purpose by a form of transaction which would not have subjected him to a tax. Said Mr. Justice Brandeis for the court: "The suggestion, if true, furnishes no reason for relieving him of tax when, for whatever reason, he chooses a mode of dealing within the terms of the act. * * * To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty." If this is true, the reverse must be true.

court looked through the form to the reality of the transaction. The government may look upon actualities, and upon determining that the form employed is unreal may disregard the effect of the fiction upon tax liability. Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. It is also settled that where a corporation enters into contract for the sale of its assets and these are then distributed as a dividend to its stockholders who perform the contract the corporation realized gain, if any, upon the transaction. Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, and this principle is likewise applied where negotiations have been entered into for the sale of its assets by a corporation, but prior to formal agreement the assets are distributed as a dividend in kind to stockholders who then make the sale to the party with whom the corporation has negotiated. Hellebush v. Commissioner, 6 Cir., 65 F.2d 902; Wichita Terminal Elevator Co. v. Commissioner, 10 Cir., 162 F.2d 513. This is on an assumption that the transaction is unreal rather than actual. A liquidation undertaken and concluded by a liquidating trustee or committee appointed by a corporation is a corporate liquidation, with profits resulting therefrom constituting corporate income. Whitney Realty Co. v. Commissioner, 6 Cir., 80 F.2d 429.

▮ But when none of these circumstances are present, where the corporation declares and pays a dividend in kind to its stockholders and the stockholders upon their own responsibility dispose of corporate assets so assigned, a gain realized from this sale may result in income to stockholders but none to the corporation. Howell Turpentine Co. v. Commissioner, 5 Cir., 162 F.2d 319.[2] That is this case. The corporation here involved had neither agreed nor negotiated for the sale of its assets prior to liquidation. It had had no dealings with Weiss. It had been considering liquidation for some time prior to actual decision and the reasons for so deciding are plain. The liquidation was not unreal or a sham. The stockholders acted upon their own responsibility and at their own risk.

The difficulty of dividing warehouse receipts calling for whiskey of varied age and quality made their sale inevitable and understandable. Certainly there can be nothing unreal in their assuming an obligation to the Chicago bank for over $1,100,000. Emphasis is placed by the appellant upon the Committee's lack of authority to act for the nonassenting stockholders. The Court held that such stockholders had ratified the assignment of their receipts to the committee by failure to complain, with ratification relating back to the time of the transfer of receipts from the corporation to the committee. Indeed, none of these stockholders protested and many of them surrendered their stock to the Trust Company so as to participate in the avails of the sale. In any event, the issue if any as to the authority of the committee to sell the minority receipts was between the committee and the stockholders, and any argument based on lack of authority on the part of the committee to receive and sell the warehouse receipts of the minority stockholders, but brings into relief the fact that the receipts were in law and in fact sold by the stockholders or on their behalf and not by the corporation.

Wichita Terminal Elevator Co. v. Commissioner, 10 Cir., 162 F.2d 513, and Meurer Steel Barrel Co. v. Commissioner, 3 Cir., 144 F.2d 282, are distinguishable from the present case upon their facts and in any event are appeals from decisions of the Tax Court of the United States adverse to the taxpayer and so compelled by the finality given to them by the rule of Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248. Fairfield S.S. Corp. v. Commissioner, 2 Cir., 157 F.2d 321, does not support the appellant's position here, for the gain there taxed was sustained because the transfer of assets from one corporation to another was neither a distribution nor partial distribution in cancelation of company stock and the implication is strong that but for that conclusion the Tax Court would have been reversed, notwithstanding the limits on the power to disturb its decisions. We conclude that the District Court

---

[2] So the Tax Court has itself held. Acampo Winery and Distilleries, Inc., v. Commissioners, 1946, 7 T.C. 629.

in the present case was not in error in dismissing the government's claim and setting aside its lien.

A second problem arises out of proceedings supplementary to the original judgment. It appears that when the intervening petitions of the government were filed the Distilleries Corporation was indebted to the government for income taxes upon an additional assessment for the year ending August 31, 1941, for declared value excess profits taxes and excess profits taxes for the year ending August 31, 1942, in total amount of $62,221.90. It also appears that the government during the pendency of the proceedings had collected by distraint the sum of $62,346.93, which the Collector in 1946 credited against taxes assumed to be owing upon the gain derived from the sale of warehouse receipts. The Distilleries Corporation did not learn of this credit until some time prior to June 7, 1946, the date upon which the original judgment was entered. It then filed an amended answer, counter-claim, and cross-petition setting up the facts and praying that the amount so collected and credited be set off against its earlier tax liability. Over the protest of the government, the amendment was allowed, and the set-off directed by the substituted judgment of December, 1946.

 The government challenges the substituted judgment on various grounds. It says, first, that the corporation was dissolved on December 31, 1942, and since by the laws of Delaware, where it was incorporated, it has the power to sue for only three years thereafter, it could not on June 7, 1946, proceed affirmatively by counter-claim. Section 42 of the Delaware Corporation Law, Revised Code 1935, Sec. 2074. The Delaware Act, however, provides that with respect to any suit commenced against it prior to the expiration of the three-year period the corporation shall for the purpose of such suit be continued as a body corporate beyond the three-year period and until any judgment therein shall be fully executed. See Eastman, Gardiner & Co. v. Warren, 5 Cir., 109 F.2d 193. If it be considered that the amended pleadings state a new cause of action it had probably abated upon the expiration of three years from and after corporate dissolution. Atkins v. W. A. Harriman & Co., Inc., 2 Cir., 69 F.2d 66; Kelly v. International Clay Products Co., 291 Pa. 383, 140 A. 143. We are, however, in agreement with the District Court that the amended petition set up nothing new and dealt solely with the form of the judgment and the relief to which the defendants might be entitled. It would seem to be elementary that the judgment rendered upon the validity of the government's claim was not a mere abstraction and the court without power to implement it by appropriate procedural directives.

The government next contends that the only way in which the appellees may recover the amount collected by it through distraint is by an independent action for refund. But the corporation's power to sue had expired by virtue of the three-year provision of the Delaware Corporation Law. It did file a claim for refund on February 19, 1946, but the Commissioner failed to rule upon it, and no suit was filed. It was therefore without remedy, unless possessed of an equitable defense to the government's suit, hereinafter discussed.

The appellant's remaining challenge to the substituted judgment is that the corporation may not set off the sum collected by distraint against an undisputed liability for taxes in earlier years on the theory of equitable recoupment, since the amount collected and the taxes owing did not arise out of the same transaction. This leads us to a consideration of the precise situation of the appellees in respect to the claims asserted by the government's intervening petitions. When the government intervened, it sought to collect not only a tax upon the gain assumed to have been derived from the sale of warehouse receipts in 1943 but also unpaid taxes for fiscal years 1941–1942. It sought judgment that the entire sum held by the Trust Company be subjected to its claim, and if this should leave the Distilleries Corporation insolvent that the stockholders be held liable for the balance as transferees of the corporation. The situation was therefore this: While the suit begun by the Louisville Trust Company was for a declaratory judgment it evolved as a suit by the government against the Distilleries Corporation for taxes, both current and those past due. So far as it involved taxes

upon gain derived from the sale of warehouse receipts, it resulted in a judgment denying the government's claim which we now affirm. Therefore, the government is in possession of funds forcibly taken by means of an invalid warrant and credited upon an invalid claim. It proposes to keep the money, and quite frankly to proceed against the corporation or its transferees to recover the amount owing for corporate taxes in prior years. If we have rightly decided the first issue, this will result in collecting twice for the same tax debt, unless adjudicated equitable principles provide an effective bar.

In Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421, and Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265, the Supreme Court found no difficulty in preventing injustice, either to the government or to the taxpayer, and in avoiding unjust enrichment of either, upon equitable conceptions of justice, and by the application of a historic remedy comparable to equitable recoupment (301 U.S. 539, 57 S. Ct. 854). It concluded that where money is taken through mistake its unjust retention is immoral and amounts in law to a fraud on the taxpayer's rights (295 U.S. 247, 55 S.Ct. 695), and even though the sovereign is not liable to respond to a petition of the taxpayer, the right it has given him to credit it or refund is available to him when the government proceeds against him for the collection of a tax. In Rothensies v. Electric Battery Co., 329 U.S. 296, 67 S.Ct. 271, 273, the Supreme Court wisely undertook to confine this principle so as to limit recoupment to those defenses which arise out of the transaction upon which the government's claim is based. The principle itself was not rejected. It was sought, however, more clearly than was generally supposed, to limit it in the revival of stale claims to those deriving from the same transaction, so as to preserve the salutary effect of statutes of repose, for it would be intolerable to have an income tax system under which there never would come a day of final settlement. "A statute of limitation is an almost indispensable element of fairness as well as of practical administration of an income tax policy."

The decision in the Rothensies case has, however, no application to the present situation. There is here no effort to revive stale claims as a set-off against a live tax liability. The Distilleries Corporation admits that it owes 1941 and 1942 taxes in stipulated amount. The government inter alia sued for their collection. It now has the money and if the decision of the District Court and our own affirmance of it are sound it has neither legal nor moral right to keep it, unless that right arises out of the antecedent debt. That right the appellees concede, and need not by us be questioned. Nothing in the Rothensies case, as we view it, precludes adjudication that the government apply the collection to the valid tax debt. So viewing the problem, it becomes unnecessary to explore the purpose of the Collector in crediting the enforced collection, in conflict with conventional practice, upon a disputed rather than upon a conceded tax liability, upon a later rather than upon an earlier debt, nor to consider whether such credit, which after all is but a book-keeping entry grounded in mistake, is irrevocable.

The judgment as amended and amplified by the substituted judgment is affirmed and the cause remanded for further proceedings consistent herewith.

ALLEN, Circuit Judge (dissenting).

I regret that I cannot agree with the conclusion of my colleagues. It is unnecessary to discuss the setoff allowed by the District Court against the undisputed tax claims. If the gain from the sale of the warehouse receipts was taxable to the corporation the Commissioner did not err in crediting the sums collected against the taxes which he asserted on the amount of such gain.

The gain was taxable to the corporation because the sale was made by the corporation, and not by the stockholders. While it is true that the committee consisting of certain dominant stockholders actually negotiated the sales of the whiskey warehouse receipts, they did this under authority of an agreement with the taxpayer embodied in a proposal made by the dominant stockholding group and accepted by resolution

of the board of directors. On December 24, 1942, the majority group addressed a letter to the directors of the corporation, making a formal offer which was accepted by the directors of the corporation on December 28, 1942. The appellee concedes in its brief that this proposal and its acceptance resulted in a contract, and it was effective prior to the sale of the warehouse receipts, and prior to the execution of the assignments by which the taxpayer transferred the equity in the warehouse receipts to the two groups of stockholders. The proposal stated that the taxpayer had delivered to stockholders whiskey warehouse receipts representing 41,354 barrels of whiskey "as our collective share of the assets distributed to common stockholders by its board of directors on December 24, 1942, as a distribution in liquidation under the plan for the complete liquidation of said corporation adopted on December 24, 1942." It further stated that it was believed to be to the best interest of all the stockholders of the corporation and desirable and beneficial to the remaining stockholders that the "distribution in kind" to such remaining stockholders "be sold, handled and disposed of in collaboration with the undersigned." The dominant stockholders proposed to the taxpayer that they should "receive, hold, sell, handle, manage and dispose of," the assets of the minority in a manner that would be for their "best benefit and advantage," and that they would pay to each of such stockholders "his or her pro rata share of the equity in said assets, or the proceeds thereof, as soon as possible and practicable, according to sound business practice" provided that the minority stockholders deposited their stock for cancellation in the manner and at the time and place fixed in the plan of liquidation. They further proposed to indemnify the taxpayer against any claims arising from the delivery of the assets, and to cause the taxpayer to be released from its bank indebtedness of over $1,100,000.

Under this contract the dominant group was obligated to handle the sale in accordance with the proposal, and was constituted the agent of the taxpayer in all subsequent transactions. This being the case, the sale was made by the taxpayer. In taxation the law looks through form to the substance. Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Hellebush v. Commissioner, 6 Cir., 65 F.2d 902.

The dividend declared by the taxpayer under its liquidation plan was in the net equity in the warehouse receipts, which covered whiskey of various ages and blends, and therefore of different value. While the directors denominated this "a dividend in kind," there was no practicable way, as testified and not controverted, to have divided the whiskey among the stockholders individually with any degree of equality. The property was received as property of the taxpayer corporation, subject to its debt and handled by the dominant group as agent of the taxpayer. The distribution was not a distribution in kind. Whitney Realty Co. v. Commissioner, 6 Cir., 80 F.2d 429, certiorari denied, 298 U.S. 668, 56 S.Ct. 834, 80 L.Ed. 1392; Hellebush v. Commissioner, supra.

The gain from the sale was therefore taxable to the corporation.