## GABRIEL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 11174.

United States Court of Appeals, Sixth Circuit.

Feb. 6, 1951.

Miller, Circuit Judge, dissented.

I. W. Sharp, Cleveland, Ohio (I. W. Sharp, L. H. Davis and R. G. Hengst, all of Cleveland, Ohio, on the brief; Hauxhurst, Inglis, Sharp & Cull, Cleveland, Ohio, of counsel), for petitioner.

Robert M. Weston, Washington, D. C. (Theron Lamar Caudle, Ellis N. Slack and Harry Baum, all of Washington, D. C., on the brief), for respondent.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

The Gabriel Company, an Ohio corporation, petitions for a review by this court of a decision of the United States Tax Court determining a deficiency in petitioner's excess profits tax for 1944 in the amount of $81,343.40. 13 T.C. 559, decided January 18, 1950.

The Tax Court filed succinct and accurate findings of fact based largely on a stipulation by the parties. In addition to the stipulated facts, petitioner introduced the testimony of three witnesses. We find nothing in the evidence to gainsay the findings of the Tax Court material to correct decision and hold that the findings are supported by the evidence and are not erroneous.

Briefly stated, from 1911 until May 2, 1925, Claude H. Foster of Cleveland, Ohio, conducted a sole proprietorship engaged principally in the manufacture and sale of automobile shock absorbers. Foster had displayed ingenuity, both in invention and in salesmanship. He succeeded first in developing and distributing widely the "Gabriel horn" and, later, the "Gabriel snubber" (an automatic shock absorber), both for use on automobiles. His business operations met with marked success. At length, he decided to sell his business, conducted under the trade name of "Gabriel Manufacturing Company", so styled because of his early success with the "Gabriel horn".

On April 20, 1925, Foster offered to sell the business and all its appurtenant assets to Otis and Company, a Cleveland investment banking firm, or to a corporation to be formed by Otis, for $4,000,000 in cash plus all federal taxes which Foster would be required to pay because of the transaction. With this offer was the proviso that Otis and Company would give, as directed by him, 1,000 of the entire 2,000 shares of Class B voting stock of the new company to four named members of Foster's organization.

Foster's offer to sell was communicated to Otis and Company by letter, dated April 20, 1925. This important letter will be quoted in full:

"Cleveland, Ohio, April 20, 1925.
"Messrs Otis and Company
Cleveland, Ohio
"Gentlemen:

"Heretofore I have been carrying on my business as an individual under the name of the Gabriel Manufacturing Company. I now offer to sell this business to you, but only upon the terms and conditions that are laid down in this letter. I am making these conditions because I desire that the management of the company shall be in the hands of certain individuals in order that the management and policies which I have built up shall be continued. I am further

anxious that the public shall be offered an opportunity to buy stock at a price which in all probability will return to the stockholders the total amount of their investment during the next five years. I am also, as a matter of friendship with your firm, entering into this transaction with you without competitive bidding, and it is my desire that your profits should be limited to whatever I consider a reasonable amount. I am attaching hereto a trial balance dated February 28, 1925, and a balance sheet of December 31, 1924. The business will be turned over to you in the condition shown on the trial balance of February 28, 1925, but subject to the ordinary changes arising out of the conduct of the business from that date; provided that as a part of the assets the cash turned over shall be $150,000.00, and said business to be subject to present salaries and bonuses to and including April 30th, 1925.

"The following are the earnings of the business for the five years ending December 31, 1924, before deduction of Federal Income Tax but after all other charges:

"1920 ..............$  797,894.49
 1921 ..............   651,381.52
 1922 ..............  1,327,715.83
 1923 ..............  1,414,393.34
 1924 ..............  1,241,366.07

"These earnings are to be verified by an accountant satisfactory to you, whose expenses you will pay.

"Predicated upon the verification of these figures, I hereby offer to turn over to you or a company to be formed by you the business in the condition outlined above, and also the real estate located in Cleveland which is now occupied by the factory. It is understood that none of the service stations, whether in Cleveland or elsewhere, nor the Canadian Company, are included in this sale. This sale includes all present American and Foreign patents covering the devices manufactured or owned in connection with the product manufactured by the American Company and also all applications for such patents. The Canadian Company, however, shall retain any patents and patent rights which it now enjoys in Canada. I understand that it is

your plan to have the business taken over by an Ohio corporation, which shall have authorized 200,000 shares of no par value stock, of which 198,000 shares shall be Class 'A' stock, and 2,000 shares shall be Class 'B' stock. Both classes of stock shall be identical in all respects, except that the Class 'B' stock shall have the sole voting rights. The Class 'A' stock shall be offered to the public at not to exceed $25.00 per share, and you will use your best efforts to sell it at this price by means of a public offering throughout the United States. Of the 2,000 shares of Class 'B' stock you will give 1,000 shares as I direct to the following members of my organization: George H. Ralls, David Benjamin, John F. Gibler and Rudolph J. Ketz. The remaining 1,000 shares of Class 'B' stock shall be held by the firm of Otis and Company. In reference to the Class 'B' stock to be issued to the above named individuals, a contract shall be made with such individuals, whereby, if any one or more of them desire to sell his stock, or if any one or more of them discontinues in the employ of the company, he or they shall offer, or such persons' administrator or executor shall offer to Otis and Company or its successor such Class 'B' stock in exchange for Class 'A' stock of the same number of shares.

"I approve the foregoing plan, and it is understood that if for legal or other reasons another plan is adopted for the distribution of this stock to the public, you will, before attempting such distribution, secure my approval.

"I agree to remain in charge of the business as heretofore until December 31, 1925, at a salary of $2,000 per month. The price of said business shall be $4,000,000.00 to me in cash, it being understood that such price includes inventory of raw material, work in process and finish product at actual cost, accounts receivable and cash on hand to the amount of $150,000 as of the close of business on April 30th, 1925, and that the balance of such purchase price is attributable to real estate, plant and equipment, patents and good will. Said amount of $4,000,000.00 in cash shall be net to me, and in addition to all Federal income and profit taxes due from me on account of

this transaction, and you are to reimburse me for the amount which I have to pay as Federal income and profit taxes because of this transaction. In preparing my tax return, however, I will consult with you and agree to make the return in such form that the amount payable by reason of this transaction shall be as small as the law will permit.

"This offer shall become a contract between us as soon as you endorse acceptance by you at the foot hereof, and I agree to turn over the business within one week after the report of the auditor to you and to me on the subject of earnings and inventory and upon payment to me of said $4,000,000.00 in cash. It is understood that you will cause the audit to be made as rapidly as possible, and that you may and will make a public offering of the stock as soon as you indicate to me that the auditor's report indicates that the figures of earnings are substantially as submitted. I will agree to furnish you with the usual data concerning the history and earnings of the company for purposes of making a public offering of the stock. It is understood, however, that all expenses of incorporation and qualifying of the securities shall be borne by you.

"It is also understood that in the event that the auditor's report and verification prove substantially as represented in this offer and that you fail to enter into the contract provided for in this offer by May second, 1925, at four o'clock P.M. of said day, and that you fail to comply fully with the payment of $4,000,000.00 in cash net to me by said time, and that you fail to comply with all the other obligations herein imposed upon you, I shall in such event have the right to declare this contract and offer cancelled by mailing notice addressed to you in the Cuyahoga Building, Cleveland, of such intention to cancel this contract and offer. It is also understood that the payment to me of said sum of $4,000,-000.00 cash net to me is not in any manner conditioned upon or postponed to the incorporation of said proposed Ohio corpo-

ration nor conditioned upon nor postponed to the authorization of such proposed stock.

"Very respectfully yours,
"/s/ C. H. Foster.
"Accepted by Otis and Company
"By: /s/ Chas. A. Otis."

This offer from Foster was formally accepted by Otis and, pursuant to the agreement, petitioner was incorporated on April 23, 1925, under the laws of the state of Ohio as "The Gabriel Snubber Manufacturing Company", [changed in 1940 to "The Gabriel Company"], with capital stock consisting of 50 shares of Class A and 50 shares of Class B stock. The classes were alike in all respects, except that all voting power was vested in the Class B stock. Its Articles of Incorporation stated that the amount of capital with which the corporation would begin business was $500. On the date of incorporation, the entire 100 shares of Class A and Class B stock were subscribed at $25 per share.

On April 24, 1925, there was presented to the board of directors of the petitioner an offer from Otis and Company to transfer to the petitioner all the property, assets, and good will of the business which Otis had agreed to purchase from Foster. Under this offer, which was accepted by the petitioner on the same date, petitioner agreed to the following conditions: "In consideration therefor you shall, if you accept this offer—(a) repay to the undersigned in cash all amounts advanced or which may be advanced for charter fees, accountants' and attorneys' fees, appraisals, certificates, stamp taxes, and other expenses incident to the organization of your Company and issuance of its stock;—(b) increase your authorized capital stock to 200,000 shares of no nominal or par value, of which 198,000 shares shall be designated as Class A without voting power, and 2,000 shares shall be designated as Class B possessing the sole voting power of the Company. All of such increase of capital stock shall be issued to the undersigned or to its nominees as fully paid and non-assessable. Conveyances, assignments and transfers of the property and business as a going con-

cern shall be made as promptly as possible, and in any event not later than May 2nd, 1925."

On April 25, 1925, the authorized capital stock of the petitioner was increased to 198,000 shares of Class A no par common stock and 2,000 shares of Class B no par common stock, as provided for in its agreement with Otis and Company, and its capital was increased to $1,000,000.

On April 27, 1925, Otis offered for sale and sold the entire 198,000 shares of Class A stock to the general public on a "When issued" basis at $25 per share.

As was found by the Tax Court, the business and assets agreed to be sold by Foster were transferred on May 2, 1925, directly to the petitioner, at the request of Otis and Company and pursuant to the provisions of the contracts. Petitioner took all the purchased assets on its books as of May 1, 1925, at a net value, over and above liabilities assumed in connection with the transfer, of $1,529,783.29, which included only $1.00 as a nominal valuation of the good will purchased. On or about the same date, 197,950 Class A shares and 1,950 Class B shares were issued to Otis or its nominees in exchange for such assets. Seven shares of Class B stock were issued in the names of the seven persons who became directors of the petitioner, two of whom were members of Otis and Company, and a stock certificate of 1,993 shares of Class B stock was issued in the name of Otis and Company. *In payment for the business and assets which he transferred to the petitioner, Foster received $4,358,-705.70, of which amount $358,705.70 represented federal taxes on the sale.* Also transferred to the four members of the Foster organization pursuant to the terms of the contract between Foster and Otis and Company, were 1,000 shares of the petitioner's Class B stock which were found by the Tax Court to have a fair market value of $25 per share. Otis and Company retained all money realized from the sale of petitioner's Class A stock above the

$4,358,705.70 paid to Foster. Incident to the marketing of the Class A stock, Otis expended approximately $200,000 in sales commissions.

The net profits, before income tax of 12½ percent from Foster's business as conducted from 1920 to 1925, were found to have been as stated in Foster's letter of April 29, 1925, to Otis and Company, quoted above; and such net profits from January 1, 1925, to May 1, 1925, were found to have been $538,509.16.

The Tax Court found that the net assets, exclusive of good will, employed by Foster in his business from 1920 to April 30, 1925, were as follows:

| | |
|---|---|
| December 31, 1919 ........ | $1,039,267.11 |
| December 31, 1920 ........ | 1,053,271.23 |
| December 31, 1921 ........ | 990,007.39 |
| December 31, 1922 ........ | 1,199,358.63 |
| December 31, 1923 ........ | 1,128,081.75 |
| December 31, 1924 ........ | 1,109,522.18 |
| April 30, 1925 ............. | 1,287,495.10 |

During the week ended May 1, 1925, 30,600 shares of petitioner's Class A stock were traded in on the New York Curb Exchange at prices ranging from a low of 26 to a high of 27⅛. Following acquisition of the assets of the business previously operated by Foster, petitioner continued to manufacture the same products.

The Tax Court included in its findings a table showing the net profits and dividends paid by petitioner during the last eight months of 1925, and the full years of 1926, 1927 and 1928, and a loss of $620,-018.17 for the year 1929.

In its 1942 excess profits tax return, petitioner claimed equity invested capital in the amount of $5,106,204.26, consisting of $106,204.26, representing money, and $5,-000,000, claimed to represent property paid in for stock, paid in surplus, or contributions to capital. In the notice of deficiency, the respondent determined that petitioner's equity invested capital as of the beginning of 1942 was $4,464,909.96. The decrease of

$641,294.30 was explained in the notice of deficiency as follows:

Taxpayer has included a larger amount for goodwill than it had actually paid for.

| | |
|---|---|
| Goodwill included in the $5,000,-000 claimed as part of invested capital ............... | $3,470,216.71 |
| Goodwill actually paid for by the company .......... | 2,828,922.41 |
| Adjustments (commissions on sale of stock) ........ | $ 641,294.30 |

In effect, respondent cut the original equity invested capital of petitioner from the $5,000,000 claimed by it to $4,358,705.-70, the amount of the cash payment made by Otis and Company to Foster, including coverage of his taxes resultant from the transaction.

Petitioner contended in the Tax Court that the transfer which took place was a sale from Foster to Otis and Company and then from Otis and Company to petitioner; and that the price paid by Otis to Foster had no bearing, or at least was not controlling, in determining the value of the property in return for which petitioner issued its stock. Petitioner contended further that $5,000,000, based upon $25 per share for 200,000 shares, was entirely too low a valuation and that the value of the property turned over to the new corporation was actually not less than $7,292,456. This figure was arrived at under the principles of ARM–34 by a capitalization of the earning capacity of the property in the years prior to the transfer over and above a fair return on the tangible property used in the business. Further support for the position that there was a value in excess of $5,000,000 was sought to be found in the fact that the stock of the company had a going market value in excess of $25 per share when traded in on the curb exchange on an if-as-and-when-issued basis. The Class B stock was not traded in contemporaneously with the organization of the company. Hence, it had no market value; but petitioner contends that, inasmuch as the Class B stock had voting power (which the Class A did not have) and

was in all other respects identical with the latter, the Class B stock had a market value equal at least to the value of the Class A stock.

The Commissioner of Internal Revenue contended in the Tax Court that the petitioner was organized for one purpose: namely, to acquire the property of Foster's business, which had a valuation placed upon it in the deal between Otis and Company and Foster. This valuation fixed by the contract was $4,000,000 plus taxes to Foster, and nothing more was paid for the property. The Commissioner asserts that it is of no consequence whether the transaction be treated as a sale from Foster to Otis and a subsequent sale from Otis to petitioner, for, if so considered, all that Otis sold to petitioner was what it received from Foster; the property and good will of a business expressly valued at $4,000,000 plus the cost to the seller in taxes on the transaction. The Commissioner insists that the fair market value of the property was fixed by the bargain between Foster and Otis and Company.

The further argument is made by the Commissioner that Otis and Company acted as underwriter of the issue of petitioner's stock, selling the stock on its own account and then paying Foster to convey the property to the petitioner. It is undisputed that Otis and Company retained as its profit on the transaction the difference between the amount of money which it paid to Foster and the total amount which it received from the sale of the stock, less its selling expenses. The Commissioner urges that there was no direct sale of the business to Otis and Company, but that Otis was merely an underwriter purchasing and reselling petitioner's stock on its own account.

Practically all the pertinent facts were stipulated and of course were accepted by the Tax Court. Virtually all testimony adduced by petitioner was offered for the purpose of showing that the going concern value of the business sold by Foster was greater than the amount received by Foster from Otis and Company. Petitioner sought to place a going concern value on the business by capitalizing its

earnings in order to place a high value on the good will.

Vice-president Klein of the Gabriel Company explained that the drop in sales of the company's products in 1928 and 1929 was due to the fact that the General Motors Company and the Ford Company both began to manufacture and use a new type of shock absorber, which was a radical departure from the Gabriel device. He admitted that, though informed as early as 1923 of the existence of a hydraulic shock absorber, the Gabriel Company had engaged in no research toward developing one for its own manufacture, and that when the device suddenly appeared in use the effect on the Gabriel business was unexpectedly deleterious.

Eaton, a partner in Otis and Company from 1921 to 1931, testified that the Gabriel Company stock issue was oversold almost immediately and that, before the Foster business and property had been transferred to the new corporation, the stock sold on the free market at a range between twenty-six and twenty-seven-and-a-half dollars per share. He gave his opinion that the stock could have been sold for thirty dollars per share, except for the binding agreement exacted by Foster that the stock must be sold to the public at twenty-five dollars per share. He said that he considered the value of the Foster business at the time of the transfer to have been $6,000,000, but admitted that he had never tried to sell to anyone at that price. On cross-examination, the witness admitted that the Foster business was a one-product enterprise and that nothing had been done by its management to hedge against the eventuality of obsolescence in the event of a new development in the art.

Inglis, an Otis and Company partner who drafted the contract between his firm and Foster and passed upon the accuracy of the stock-sale prospectus, swore that statements made by the brokerage firm to the public concerning the stock and the business were correct. This has not been challenged.

Having outlined the salient facts, we turn now to a discussion of the opinion of the Tax Court, the opening paragraph of which states that the sole question presented concerns the amount which petitioner may include in computing its equity invested capital under section 718 (a) of the Internal Revenue Code, 26 U.S.C.A. § 718(a) to represent the value of the property and assets of the business, including good will, acquired by the petitioner in 1925.

Section 718(a) provides: "Equity invested capital

"(a) *Definition.* The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

"(1) *Money paid in.* Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

"(2) *Property paid in.* Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange."

After stating the contentions of the parties, the Tax Court asserts that the transaction involved was a single transaction among three parties, namely Foster, Otis and Company, and petitioner, a newly organized corporation, and "must be viewed as a whole." The Tax Court thus analyzed the transaction: "The nature of the transaction between Foster and Otis & Company is carefully spelled out in the contract of April 20, 1925. The stock of the new company was to be sold to the public at $25 per share and no more. The management of the new company was to be in the executives of the old Foster organization who were to receive 1,000 shares of Class B stock, which constituted 50 per cent of the voting stock of the new company. The underwriting commissions of Otis and Company were fixed and limited by Foster. Unless each and every term of the contract was followed, Foster reserved the right to cancel the contract. *This transaction was in no sense an outright sale of Foster's business to Otis &*

*Company but, on the contrary, Otis & Company was simply the underwriter purchasing and reselling petitioner's stock on its own account and not as the petitioner's agent."* [Italics supplied.]

■ Judge Arundell who wrote the opinion of the Tax Court, pointed out that the law is well settled that where a broker purchases stock at a discount for resale on its own account rather than where the broker acts as an agent for the issuing company in marketing securities, only the amount received by the corporation from the broker is includible in its equity invested capital, regardless of the price ultimately secured for the stock by the broker upon resale to the public. The following authorities were cited in support of this proposition: Simmons Co. v. Commissioner of Internal Revenue, 8 B.T.A. 631, affirmed, 1 Cir., 33 F.2d 75, certiorari denied Simmons Co. v. Lucas, 280 U.S. 588; Warner Co. v. Commissioner, 11 T.C. 419, 432–434, affirmed by per curiam an opinion of Tax Court, 3 Cir., 181 F.2d 599; Cleveland Graphite Bronze Co. v. Commissioner of Internal Revenue, 10 T.C. 974, 986, 987, affirmed per curiam on findings and opinion of Tax Court, 6 Cir., 177 F.2d 200; American Business Credit Corp. v. Commissioner of Internal Revenue, 9 T.C. 1111, 1118, cf. Palomar Laundry Co. v. Commissioner of Internal Revenue, 7 T.C. 1300.

In our judgment, the Tax Court correctly construed and applied the authorities which it listed.

In Simmons Co. v. Commissioner of Internal Revenue, 1 Cir., 33 F.2d 75, 76, supra, the Court of Appeals held that commisssions paid to bankers by a corporate taxpayer on sales of its own capital stock or discounts from par allowed to purchasers of stock cannot be included as part of "invested capital" to increase thereby the amount on which the taxpayer is entitled to normal profits and to reduce its tax, since the Revenue Act of 1918, section 326(a), by enumerating items of invested capital by necessary implication, excludes commissions because not enumerated. The opinion writer said: "Such commissions obviously decrease the amount of capital available for the business operations of the concern. They contrast with the ideas contained in 'actual cash,' 'actual cash value of tangible property,' 'paid in or earned surplus and undivided profits'. All these add to the resources of the corporation. Commissions paid for marketing stock simply diminish the net return from the stock issue." The court declared that the statutory concept of what is "invested capital" is clear and that the language used in La Belle Iron Works v. United States, 256 U.S. 377, 41 S.Ct. 528, 65 L.Ed. 998, quoted with approval in Willcuts v. Milton Dairy Co., 275 U.S. 215, 219, 220, 48 S.Ct. 71, 72 L.Ed. 247, was conclusive against the taxpayer's contention that commissions paid by it on the sale of its stock should be included as part of its invested capital.

In Cleveland Graphite Bronze Co. v. Commissioner, supra, this court affirmed the decision of the Tax Court on its findings and opinion. 177 F.2d 200. In that case, the corporate petitioner entered into an underwriting agreement with two underwriters covering the purchase by them of 30,000 shares of its newly authorized preferred stock at $100 per share, the petitioner agreeing to pay the underwriters a commission of $3.50 per share, or $105,000 for their services. Shares were offered to the public and about one week later petitioner received the broker's check for $3,000,000, whereupon the underwriters were paid $105,000 by the corporation as agreed. Certificates for all the shares were issued to the underwriters. This court approved the holding of the Tax Court that equity invested capital is what the stockholders paid for their stock and that, inasmuch as the underwriters actually bought the stock on their own accounts, the price paid by them determined the addition to equity capital for the purpose of computing excess profits taxes.

In the Warner Company case supra, the petitioner sold to bankers certain shares of stock under an agreement that the bankers could sell the stock at any price obtainable, but that the bankers must

divide with the petitioner any profit in excess of a certain amount. The Tax Court held that the provision for the division of the profits was insufficient to bring the relation between the petitioner and the bankers to that of principal and agent. It was asserted that the stock was bought by the bankers from the corporation and the amount paid by them to it determined the equity invested capital growing out of the transaction. The Tax Court cited its decision in the Cleveland Graphite Bronze Company case, supra, and said: "In the instant case the bankers were not agents for the petitioner, taxpayer, in the purchase of the stock. They were themselves the purchasers of the stock. They bought at a discount from par, and the profit realized on a resale to the public is not to be included in petitioner's equity invested capital." The decision was affirmed by the Court of Appeals on the opinion of the Tax Court, 3 Cir., 181 F.2d 599.

In Palomar Laundry Co. v. Commissioner of Internal Revenue, 7 T.C. 1300, supra, where pursuant to an agreement entered into with a stockbroker incident to petitioner's organization in 1925 the petitioner corporation issued 400 shares of its preferred stock to the broker as a commission for his services in selling other shares of petitioner's preferred stock, it was held that the services rendered by the broker did not constitute "property paid in" for the 400 shares of stock issued to him within the meaning of the statute and that, therefore, the fair market value of those shares of stock was not includibly in petitioner's equity invested capital under section 718 of the Internal Revenue Code, 26 U.S.C.A. § 718. The decision of the Tax Court in Graton & Knight Co. v. Commissioner, 1949, 13 T.C. 1109 is to the same effect as its decision in the instant case.

We think the Tax Court in the present controversy has adhered with practicality to the principle enunciated by the Supreme Court thirty years ago. In La Belle Iron Works v. United States, decided in 1921, 256 U.S. 377, 387, 388, 41 S.Ct. 528, 530, 65 L.Ed. 998, the Supreme Court, speaking in relation to War Excess Profit Taxes provided for in the Revenue Act of 1917, said that Congress had designedly adopted the term "invested capital" to "measurably guard against inflated valuation"; and that the word "invested" in itself imports a restrictive qualification. The opinion stated: "When speaking of the capital of a business corporation or partnership, such as the act deals with, 'to invest' imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains." The rationale of the La Belle Iron Works opinion, in our view, supports the Tax Court's decision that for tax purposes petitioner's invested capital arising out of its acquisition of the property of Foster through the dealings of Otis and Company for the stock of the petitioner should be limited to the amount paid by Otis and Company to Foster for such property.

We think the cases cited by the Tax Court upon the proposition that the transaction with which we are concerned in this case "was a single one and must be viewed as a whole" by analogy support its position. West Texas Refining & Development Co. v. Commissioner of Internal Revenue, 10 Cir., 68 F.2d 77; Halliburton v. Commissioner of Internal Revenue, 9 Cir., 78 F.2d 265.

Of the very few cases cited by petitioner, Hazeltine Corporation v. Commissioner of Internal Revenue, 3 Cir., 89 F.2d 513, is its chief dependence. The case is far afield, involving as it did the depreciation basis of property acquired by a corporation in exchange for stock. The cost of the property measured by the fair market value of the stock issued in exchange for it was held to be the correct basis for determining the depreciation. Here, the issue is whether profits accruing to an underwriter from the sale of the stock of a corporation organized by the under-

writer to acquire property for an agreed amount are to be included in the corporation's "equity invested capital" for excess profits tax purposes pursuant to section 718(a) of the Internal Revenue Code, 26 U.S.C.A. § 718(a).

■ We hold that the Tax Court correctly concluded that Otis and Company's profits are not includible taxwise in the petitioner's equity invested capital, and properly decided that the petitioner is entitled to include in its equity invested capital only the $4,358,705.70 representing the amount of cash paid to Foster for the transfer of his business to petitioner, plus $25,000 determined by the Tax Court to have been the fair market value of the 1,000 shares of Class B stock which were transferred to the four executives named by Foster.

The decision of the Tax Court is affirmed.

MILLER, Circuit Judge (dissenting).

The ruling of the Tax Court appears to me to be based upon the assumption that the taxpayer bought the business of Claude H. Foster from Foster through a cash payment from it to Foster of $4,358,705.70, raised for it through the underwriting services of Otis & Company. I would concur in an affirmance of the judgment if I could agree with that factual basis. However, as I view the facts, the taxpayer (1) did not buy the business from Foster, (2) did not sell its stock to Otis & Company, the underwriter, for money, and (3) did not pay for the business with cash.

It is true that Foster sold his business for $4,358,705.70 cash, but that sale was to Otis & Company, not to the taxpayer. The taxpayer was not in existence at that time. The later sale from Otis & Company to the taxpayer was evidenced by a separate sales contract with different terms.

It seems clear to me from the subsequent contract of sale between Otis & Company and the taxpayer that the taxpayer not only bought the business from Otis & Company, who was then the owner and with whom the contract was made, but that payment was made in stock, not in cash. This contract, dated April 24, 1925, provides that *"in consideration"* of Otis & Company procuring a conveyance of the business to the taxpayer, the taxpayer would repay Otis & Company for certain expenses, increase its authorized capital stock to 200,000 shares, and that "all of such increase of capital stock shall be issued to the undersigned or its nominees as fully paid and nonassessable," Otis & Company being the undersigned. The last paragraph of the contract refers to the assets "proposed to be transferred to you in *payment for stock.*" The stipulated facts state that the taxpayer had no other agreement with reference to the issuance of its stock. No cash figure is mentioned as the purchase price. It contains no provision respecting the price at which the stock would be sold to the public, nor any provision concerning the disposition of the proceeds to be received by Otis & Company from the resale. The stipulated facts state that all the shares of stock "were issued to Otis & Company, * * * in exchange for all the assets, including good will, of the business * * *." The Tax Court recognized this fact in the statement in its opinion "Otis & Company was simply the underwriter purchasing and reselling petitioner's stock on its own account and not as the petitioner's agent." It seems clear to me that Otis & Company not only purchased taxpayer's stock on its own account, but also paid for that purchase by transferring to the taxpayer the business property herein involved. That is what the contract provided, and that is what the taxpayer actually received. The taxpayer did not in fact receive any money for its stock.

Under sections 718(a)(2) and 113(a) of the Internal Revenue Code, 26 U.S.C.A. §§ 113(a)(2), 718(a), the equity invested capital includes property previously paid in for stock, such property being valued at its cost. Section 35.718–1 of Regulations 112 provides: "If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance." Our

problem is to determine the fair market value of the stock issued to Otis & Company at the time of its issuance. There are established and approved methods for determining that value. What Foster received for the property, through a non-competitive sale accompanied by unusual conditions of his own choosing, is not the formula to be used. Instead, we must determine the fair market value of what the taxpayer gave in exchange for the property. Appeal of Markenheim Co., 1 B.T.A. 1240; Cassidy Company, Inc., v. Commissioner of Internal Revenue, 11 B.T.A. 190. That is the taxpayer's investment. La Belle Iron Works v. United States, 256 U.S. 377, 388, 41 S.Ct. 528, 65 L.Ed. 998. Since the taxpayer gave its stock for the property, rather than money, the fair market value of the stock so exchanged is the issue to be decided in this case. Hazeltine Corp. v. Commissioner of Internal Revenue, 3 Cir., 89 F.2d 513. Whether that value is different, and by how much, from the figure used by the Tax Court, is not now before us. In my opinion, the method used in reaching that valuation was incorrect.

In some cases, where tax avoidance is the dominant purpose, formal legal transactions, unaccompanied by a bona fide business purpose, have been disregarded by the Courts. Tax avoidance is lacking in the present case. The transaction took place in 1925. The tax involved is for the year 1944. The bona fide character of the transaction is not questioned. The business purpose was and is a very generally accepted one, designed to meet the needs of the seller, who would probably have had great difficulty in obtaining his purchase price of over four million dollars from any one other than a corporate purchaser, particularly under the conditions imposed. I do not believe the Court is justified in disregarding the legal form which the transaction took in the present case. United States v. Cummins Distilleries Corp., 6 Cir., 166 F.2d 17, 20–21. Even if we accept the view of the Tax Court that the transactions must be considered as a whole, and not divided into separate transactions through an intermediary, the

net result was that the taxpayer acquired the business of Foster in exchange for its stock. The fair market value of the business and the fair market value of the stock are the decisive elements in determining the fair market value of its investment, rather than the arbitrary, non-competitive figure placed upon the business by Foster.

I am of the opinion that the judgment should be reversed and the case remanded to the Tax Court with directions to redetermine the invested capital of the taxpayer in accordance with the views expressed herein.