A. D. SAENGER, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68117. Promulgated September 30, 1935.

*S. L. Herold, Esq.*, and *S. P. Cousin, Esq.*, for the petitioner.

*DeWitt M. Evans, Esq.*, and *F. B. Schlosser, Esq.*, for the respondent.

OPINION.

LEECH: Respondent determined that petitioner was formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholder through the medium of permitting its gains and profits to accumulate instead of being distributed. Thereupon, pursuant to section 104 (a), Revenue Act of 1928, he levied a tax of 50 percent upon petitioner's net income for 1929, and gave due

notice to petitioner of a deficiency of $65,808.05 in 1929 income taxes, the entire amount of which results from that determination. Petitioner challenges the correctness of that determination. Alternatively, petitioner alleges error in respondent's determination of its 1929 net income, determinable with reference to section 104 (c); and, also, it contends that section 104 is unconstitutional.

Petitioner, a Louisiana corporation with its principal office at Shreveport, was organized on August 7, 1929, to take over all of the shares in the A. &. J., Inc., owned by A. D. Saenger. It keeps its books and renders returns on a cash basis.

Prior to 1927, A. D. and J. H. Saenger, brothers, conducted many different and varied lines of business, including a drug store, motion picture theaters, real estate, and investments in securities, as a partnership, under the firm name and style of Saenger Brothers. They organized the A. & J., Inc., a Louisiana corporation, on March 1, 1927, and conveyed to it all of the partnership assets, except certain shares in Saenger Theatres, Inc., for all of the 15,000 shares of that company's stock, which, except for two shares to qualify a director, were divided equally between them, 7,499 to each.

On August 7, 1929, A. D. Saenger caused the petitioner to be organized and conveyed to it, in exchange for all ($500,000 par value) of its capital stock, his 7,499 shares in the A. & J., Inc. The fair market value of those 7,499 shares, as of the date of the exchange, was $2,077,522.96, but they were entered on petitioner's books at $749,900, their par value. On the same day, J. H. Saenger caused J. H. Saenger, Inc., to be organized and conveyed to it, in exchange for all of its capital stock, his 7,499 shares in the A. & J., Inc. The two brothers and one Oliphint were the officers and directors of these two companies and of the A. & J., Inc.

The petitioner's only income in 1929 was dividends on stocks of domestic corporations. Its cash receipts in 1929 from that source amounted to $23,804.90, of which $22,204.90 was dividends on shares in the A. & J., Inc. Its cash disbursements in 1929, to meet current expenses, amounted to $1,233.91.

On October 31, 1929, the A. & J., Inc., declared "a dividend of 17½ per cent on the outstanding stock of the A. & J., Inc.", which amounted to $262,500, of which $131,250 was payable to petitioner. The sum of $262,500 was "appropriated from the surplus earnings of the company for the said dividend," the dividend was "due and payable as of this date", the treasurer was "directed to notify the stockholders of this dividend, and to pay same by crediting said dividend to the individual accounts", and the remainder due the stockholders, after offsetting any amounts owing to the company, was to be "drawn out as the said stockholders desire." The A. & J. Co. did not have in 1929, after the dividend declaration, sufficient

cash with which to pay either its current liabilities or the dividend; it did have, however, marketable securities, most of which were listed and actively dealt in on the New York Stock Exchange, having a then fair market value of at least $1,750,000, which is about $1,250,000 more than its then current liabilities and dividend obligation.

Within the taxable year, the petitioner charged the A. & J., Inc., on its books, with its $131,250 share of the dividend declared on October 31, 1929, and it reported that amount in its tax return. It actually received $22,204.90 in cash from the A. & J., Inc., in 1929, on account of that dividend.

On December 31, 1929, the petitioner had cash funds of $8,001.83 and outstanding current liabilities of $91,953.54. The fair market value of the securities which it owned on December 31, 1929, including the aforesaid 7,499 shares in the A. & J., Inc., was, as of that date, $1,561,396.24; and the fair market value of its net assets, as of the same date, over and above the par value of its capital stock, was $1,108,750.83.

The petitioner did not declare or pay any dividends in 1929, 1930, and 1931. Whether or not it had any gains or profits in 1930 and 1931 does not appear from the record. At the close of those years, A. D. Saenger, sole shareholder, was indebted to it, on account of cash loans, in the amounts of $22,261.20, $101,061.77, and $185,025.26, respectively. Also, A. D. Saenger was further obligated to the petitioner at the close of 1931, in the sum of $193,000, the explanation of which is not clear on the record.

Section 104 of the Revenue Act of 1928 [1] lays a tax of 50 per centum upon the net income, including corporate dividends, of any corpo-

---

[1] (a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

(c) As used in this section the term "net income" means the net income as defined in section 21, increased by the sum of the amount of the dividend deduction allowed under section 23 (p) and the amount of the interest on obligations of the United States issued after September 1, 1917, which would be subject to tax in whole or in part in the hands of an individual owner.

(d) The tax imposed by this section shall not apply if all the shareholders of the corporation include (at the time of filing their returns) in their gross income their entire distributive shares, whether distributed or not, of the net income of the corporation for such year. Any amount so included in the gross income of a shareholder shall be treated as a dividend received. Any subsequent distribution made by the corporation out of the earnings or profits for such taxable year shall, if distributed to any shareholder who has so included in his gross income his distributive share, be exempt from tax in the amount of the share so included.

ration formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed; and the fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, is prima facie evidence of a purpose to escape the surtax. Construing the substantially similar provisions of section 220, Revenue Act of 1921, the Circuit Court of Appeals, Second Circuit, in affirming 19 B. T. A. 809, stated in *United Business Corporation of America* v. *Commissioner*, 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635, as follows:

The section declares that when a company is formed or used " for the purpose of preventing the imposition of the surtax upon its stockholders " by allowing " its gains and profits to accumulate instead of being divided or distributed," it shall pay twenty-five per cent more than its proper tax. It is presumptive evidence of such a purpose that it is " a mere holding company, or that the gains and profits are permitted to accumulate beyond the reasonable needs of the business," provided that the Commissioner shall so certify. Ordinarily it will indeed be difficult to prove the forbidden purpose, unless the accumulations are too large for the fair needs of the business. But it may not be impossible to do so, even though the profits arise out of normal business, as they did not here. The management may for example be shown to have always been sanguine, and to have withheld only small reserves, though prudence justified more. A sudden change of policy, coincident with large increases in the surtax rates, might in that situation betray a purpose to accumulate against a season more propitious for distribution. Or the officers might unguardedly disclose a scheme to avoid surtaxes, though the other evidence was not enough. A statute which stands on the footing of the participants' state of mind may need the support of presumption, indeed be practically unenforceable without it, but the test remains the state of mind itself, and the presumption does no more than make the taxpayer show his hand.

But, as the court there indicated, the display of that " hand " does not relieve the taxpayer if it discloses the state of mind the statute condemns.

At the time the petitioner was organized, the two Saenger brothers had a substantial investment in the A. & J., Inc., which they owned in equal proportions and without any adverse interest. At that time, A. D. Saenger had a minor daughter, who, he was advised, by virtue of the " Louisiana Community Law ", could tie up his estate, in the event of his death before she attained her majority. At the same time, J. H. Saenger had become involved in a social relation, which needs no more definitive specification here. In connection with this latter situation, it was testified that there was some uncertainty in the minds of the two brothers, as well as their confidential adviser, as to the place a third party might attain in the affairs of the A. & J., Inc., in the event of the prior decease of J. H. Saenger. What that uncertainty was based upon we have not been advised, nor have we been

sufficiently informed of the facts of the situation to justify any conclusion as to its reality. At any rate, so the testimony goes, the brothers were apprehensive of the effect these conditions would have upon their estates and the extent to which they would "interfere with the policy" of the A. & J., Inc., in the event of the death of either. So they resolved to remove this uncertainty by creating separately owned corporations to hold their shares in the A. & J., Inc., and making new wills under which control of these corporations would be placed in the surviving brother and their confidential adviser. This they did; and so the petitioner was brought into being. These, it is further testified, are the antecedent facts and circumstances to petitioner's birth, and in them rests the motive or purpose of its creation. But we are not convinced that such are the antecedent facts and circumstances.

Conceding the brothers' objectives—control of their estates and of the A. & J., Inc., in the surviving brother—nothing was or could be done toward the attainment of those objectives by the interposition of the separately owned corporations. The only change wrought by creating these corporations is that, upon the death of either brother, the shares in his separately owned corporation will pass to his estate, instead of the shares in the A. & J., Inc., which he formerly owned. This change could in nowise vest post-mortem control of the estate of either in the surviving brother. Nor could control of the A. & J., Inc., in the surviving brother be made any more secure by the change, for that control is dependent upon control of the shares in the separately owned corporations. Control of their estates, which would include the shares of the separately owned corporations with accompanying control of the A. & J., Inc., could only vest in the surviving brother by appropriate testamentary provisions. It is thus evident that the creation of the separately owned corporations was not a necessary step in the carrying out of the brothers' purpose to place control of their estates and of the A. & J., Inc., after death, in the hands of the surviving brother. Being an unnecessary one, why then was the step taken? On that score the record is entirely silent, and we can think of no plausible reason or explanation. Under the circumstances, other evidence of record must be examined to determine, if possible, the real purpose of petitioner's organization.

The petitioner was organized as a mere holding company, to take over and hold the shares owned by A. D. Saenger, in the A. & J., Inc., and, it is assumed, to collect and distribute the dividends thereon. Saenger's income in prior years is not disclosed. Within the taxable year, and prior to the organization of petitioner, he had received, in one form or another, his proportionate share of a dividend of $150,000 declared by the A. & J., Inc., in February of

that year. The surtax on that share, assuming no other income, amounted to $6,960. Within three months after petitioner was organized, and during the taxable year, the A. & J., Inc., declared a further dividend of $262,500, of which $131,250 was payable to petitioner. The petitioner had the unqualified right, under the dividend resolution, to demand and receive payment of its share of the dividend within the taxable year. Had not Saenger organized and turned over to petitioner his shares in the A. & J., Inc., he would have had the same unqualified right to demand and receive the same share of the dividend as went to the petitioner, and the surtax thereon, assuming no income other than dividends from the A. & J., Inc., would have amounted to an additional $34,290, making a total surtax of $41,250 for the year on dividends of the A. & J., Inc. By organizing the petitioner to hold his shares in the A. & J., Inc., Saenger was enabled to escape the additional surtax. (See later discussion of when the dividend was income to petitioner.) Of its entire share of the dividend, petitioner received $22,204.90, cash, in 1929. Its cash receipts for the year, consisting entirely of dividends, less cash expenses amounted to $22,570.99. No dividend was declared or paid by the petitioner in 1929, but, instead, Saenger borrowed from it $22,261.20, or all but $300 of its net cash income. Of the balance of $109,045.10 due the petitioner from the A. & J., Inc., on account of the October dividend, $92,206.62 was received by petitioner in 1930; and again in that year it did not declare or pay a dividend, but, instead, Saenger borrowed from it the further sum of $78,800.57. Such loans, alone, are significant of the proscribed intention. *William C. De Mille Productions, Inc.*, 30 B. T. A. 826; *United Business Corporation of America* v. *Commissioner, supra*.

Nor is that all. The Saenger brothers and their confidential adviser were the officers and directors of the petitioner, J. H. Saenger, Inc., and the A. & J., Inc. The Saenger brothers were dominant in the A. & J., Inc., and each was dominant in his separately owned corporation. All three companies were bent to their will. As officers and directors of the A. & J., Inc., they withheld from petitioner more than 80 percent of its share of the October dividend, and, as officers and directors of the petitioner, they withheld demand for full payment of that dividend. Their conduct of the affairs of the one was made to fit their conduct of the affairs of the other. By declaring the dividend, crediting it on its books to stockholders' accounts and making it available " as the stockholders desire ", they avoided any charge that the A. & J., Inc., was availed of in 1929 for the purpose of preventing the imposition of the surtax upon its shareholders; and, by causing the withholding of payment to petitioner of its full share of the dividend and the failure to make demand therefor, they evidently hoped to avoid a like charge in the case of

the petitioner. The amount actually paid to petitioner within the year was comparatively small. What other reasonable explanation can there be for the failure to demand and make payment of the full dividend due the petitioner, especially when the A. & J., Inc., had sufficient assets out of which to make payment and the petitioner had maturing current obligations almost equal to the amount of the dividend? It is said, in explanation, that the A. & J., Inc., was not in any position during the taxable year to make full payment of the October dividend, and, therefore, that petitioner's share was never subject to withdrawal. It is true that at no time after the dividend declaration did the A. & J., Inc., have sufficient cash to pay its current liabilities at maturity, much less its dividend obligations, and that the market value of the securities in its portfolio had sunk to a level much below their cost. It is equally true, however, that the dividend was declared and made subject to immediate withdrawal by the stockholders in the face of those very conditions, and the A. & J., Inc., had marketable securities, which, at their depreciated values, were worth $1,250,000 more than the total of its current and dividend obligations, out of which to pay the dividend. At the time the dividend was declared, the A. & J., Inc., had cash of $4,500 and its outstanding current liabilities amounted to $215,000. It is evident, therefore, that, if it was intended to pay the dividend at all, the intent was to pay it out of borrowed funds or out of the proceeds from the sale of securities in the company's portfolio. Furthermore, the dividend was declared 15 days after the inception of the stock market crash and at a time when much of the force of the crash had been spent. The directors must have been fully aware then of the admittedly large decline in value of the company's assets. Neither lack of funds nor decline in value of its assets prevented the A. & J., Inc., from declaring the dividend. There was no refusal of payment thereof on its part. So, the reasons advanced contain no extenuating circumstances for the directors' failure to demand and make payment of the full dividend due the petitioner. We think that was a designed and deliberate failure, in order that the petitioner might not redistribute to its lone shareholder the dividend which, were it not for its interposition, would have gone directly and been taxable to that shareholder, while at the same time avoiding any appearance of a large undistributed surplus of petitioner for the taxable year.

It is contended by the petitioner that its cash position in 1929 was never such as to enable it to distribute the gains and profits of the year. But the contention entirely overlooks the fact that the petitioner received $22,204.90 in cash from the A. & J., Inc., during the year, and immediately, or shortly thereafter, loaned that much and more to its shareholder. Apparently, the petitioner had no need for this cash, at the time it received it, otherwise it would have been retained

in the treasury or used for legitimate business purposes. It could have been distributed as well as loaned to the petitioner's shareholder.

It is further contended that, in view of the adverse business and economic conditions inaugurated by the stock market crash in the fall of 1929, sound business practice dictated "the retention of funds which otherwise might and should have been distributed"; and that it would have been an economic folly, considering the surrounding circumstances and the befogged prospects of the future, to have depleted the treasury by distribution of a cash dividend. It seems to us, however, that the petitioner's conduct is a complete answer to these representations. It did deplete its treasury by loans to its sole shareholder. These loans are incompatible with a purpose to strengthen the petitioner's financial position, but entirely accord with the shareholder's desire to secure the equivalent of his dividends under another guise.

Petitioner finally argues that, because of a $400,000 shrinkage in the value of its assets in 1929, it had no "bona fide cash surplus of profits" within the meaning of section 1, Act No. 241 of 1908, General Assembly of Louisiana,[2] and, therefore, it was prohibited by statute from paying any dividend in that year. That statute, however, has been superseded by section 26, Act No. 250 of 1928, General Assembly of Louisiana,[3] by the provisions of which a corporation may lawfully pay a dividend in cash or property out of, among other things not material here, the surplus of the aggregate of its assets over the aggregate of its liabilities, plus the amount of its capital stock. Even at the depreciated values of its assets, after the stock market crash in the fall of 1929, the aggregate of petitioner's assets over the aggregate of its liabilities, plus the amount of its capital stock, was more than $1,100,000. There was, therefore, no statutory bar to the payment of a dividend by the petitioner in 1929.

[2] That it shall be unlawful for any domestic corporation, or for any foreign corporation doing business in this State, to make or declare any dividend on its capital stock except from its actual and bona fide cash surplus of profits; or to divide, withdraw or in any manner to pay to the stockholders, any portion of the company's capital stock.

[3] DIVIDENDS: METHOD OF ESTIMATING FUND FOR PAYMENT OF. I. No corporation shall pay dividends in cash or property, (a) except from the surplus of the aggregate of its assets over the aggregate of its liabilities, plus the amount of its capital stocks; or (b) out of any surplus due or arising from (1) any profit on treasury shares before resale; or (2) any unrealized appreciation in value or revaluation of fixed assets; or (3) any unrealized appreciation in value or revaluation of inventories before sale; or (4) the unaccrued portion of unrealized profit on notes, bonds or obligations for the payment of money, purchased or otherwise acquired, unless such notes, bonds or obligations are readily marketable, in which case they may be taken at their actual market value; or (5) the unaccrued or unearned portion of any unrealized profit in any form whatever, whether in the form of notes, bonds, obligations for the payment of money, installment sales, credits or otherwise, except as provided in the preceding subparagraph (4).

II. In case all or any part of any cash dividend is paid out of paid-in surplus, the shareholders shall at the time of payment be notified of that fact.

III. No corporation shall pay dividends in shares of the corporation, except from the surplus of the aggregate of its assets, which, for this purpose only, may include items mentioned in Subdivision I (b), over the aggregate of its liabilities, plus the amount of its capital stock.

In view of the foregoing, we find as a fact and hold that the petitioner was formed and availed of for the purpose of preventing the imposition of the surtax upon its shareholder through the medium of permitting its gains and profits to accumulate instead of being divided or distributed; and that, under the circumstances, the respondent has correctly asserted against the petitioner the 50 percent tax imposed by section 104 (a).

This brings us to the first of petitioner's alternative issues, that respondent has incorrectly included in the net income, subject to the 50 percent tax imposed by section 104 (a), the entire amount of petitioner's share of the October dividend of the A. & J., Inc., that is, $131,250, instead of $22,204.90, the amount actually received in cash in the taxable year. Since petitioner kept its books and rendered its tax return on a cash basis, the respondent evidently included the larger amount on the theory that it was constructively received by petitioner in the taxable year. We think the respondent is right.

The question of whether a taxpayer on a cash basis is constructively in receipt of income in the form of the presently involved dividend, is one of fact. *Avery* v. *Commissioner*, 292 U. S. 210.

Here we have an unequivocal declaration of a dividend that was payable within the taxable year, an appropriation for its payment, notification to the stockholders of the declaration, authority to the treasurer to pay the dividend, and the dividend made available for withdrawal by the stockholders as and when they chose, subject to the single limitation or restriction, which did not apply to this petitioner, that payment was to be made in the first instance by offsetting against any shareholder's share of the dividend any indebtedness of said shareholder to the company. The dividend of $131,250 was fully and unqualifiedly available to the petitioner and could have been reduced to actual possession and realization merely for the asking. "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." *Corliss* v. *Bowers*, 281 U. S. 376. It was constructively received by the petitioner in the tax year, and was thus properly so taxed by respondent. *Adler* v. *Commissioner*, 77 Fed. (2d) 733, affirming 30 B. T. A. 897; *Loose* v. *United States*, 74 Fed. (2d) 147; *James E. Lewis*, 30 B. T. A. 318. Cf. *C. E. Gullett*, 31 B. T. A. 1067. The case of *Avery* v. *Commissioner, supra,* which petitioner cites in support of its position that so much of the dividend as was not actually reduced to possession within the taxable year is not income for that year, is clearly distinguishable upon the facts.

The constitutional questions presented by the petitioner's second alternative issue have heretofore been considered, and decided adversely to the petitioner. *United Business Corporation of America*

v. *Commissioner, supra; Williams Investment Co.* v. *United States,* 3 Fed. Supp. 225.

Reviewed by the Board.

*Judgment will be entered for the respondent.*