BUSH BROTHERS & COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 808–76.    Filed December 5, 1979.

*W. W. Davis* and *W. W. Davis, Jr.,* for the petitioner.
*Robert B. Nadler,* for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in the petitioner's Federal income taxes for the fiscal years ending (FYE) April 30, 1972, and April 30, 1974, in the amounts of $30,012.24 and $396,337.66, respectively, as set forth in his statutory notice of deficiency dated November 4, 1975. Presented for our decision are (1) whether a sale by petitioner's shareholders of a dividend in kind of navy beans by petitioner will be imputed to petitioner, (2) whether these dividends sold by the shareholders were anticipatory assignments of income and thus part of petitioner's income, (3) whether petitioner properly evaluated the cost of the distributions of navy beans, and (4) whether a distribution declared April 20, 1971, but made on June 15, 1971, within the FYE April 30, 1972, is barred from consideration here by the statute of limitations of section 6501(a).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference.

Petitioner Bush Bros. & Co. is a corporate continuation of a proprietorship founded by A. J. Bush in 1897. For each of the FYE April 30, 1972, through April 30, 1974, petitioner timely filed a Federal corporate income tax return with the Internal Revenue Service Center, Memphis, Tenn., using the accrual method of accounting, which it still employs. Located both then

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

and now in Dandridge, Tenn., petitioner operates a food processing and canning business involving various produce items, including navy beans which are used to make both pork and beans and baked beans. These processes are conducted in eight plants located in various States and in a wholly owned subsidiary known as Blytheville Canning Co. (Blytheville), located in Blytheville, Ark. During the time in question, petitioner had over 50 shareholders all of whom were Bush family members, related in some way to one of the six children of the founder A. J. Bush.[2] No one stockholder and no one of the

---

[2]Stockholders as listed by Bush family members:

H. C. BUSH FAMILY
H. C. Bush
Condon S. Bush
Allen J. Bush
Kathleen Bush
Jean Bush Nankivell
Ann Holmes Bush
Allen J. Bush, custodian for Andrew J. Bush
Allen J. Bush, custodian for Steven H. Bush
Allen J. Bush, custodian for Douglas B. Bush
Condon S. Bush, custodian for Sarah E. Bush
Condon S. Bush, custodian for Rachel Ann Bush
Kenneth D. Higgens and Wm. P. Biddle III as trustees of
The Nankivell-Bush Trust, dated 3/25/68
Betsey R. Bush
Kathleen N. Forrester
Rebecca N. DeVault
Elizabeth N. Wilson
Walter Gary DeVault
E. Roy Nankivell, Jr.
John Jay Bush

FRED C. BUSH FAMILY
Jack T. Bush
Vera T. Bush
Jack C. Bush
Charlotte Bush Rigsby
Eugenia C. Bush
Iris Gayle Bush
J. R. Harrington, trustee for Vera T. Bush
Jack C. Bush, custodian for Kristian M. Bush
Jack C. Bush, custodian for Brandon Jackson Bush
Terry Allen Rigsby

ALGER E. BUSH FAMILY
Eula T. Bush
Evelyn B. Sliger
W. W. and Betty B. Workman, trustees
Betty and Wayne Workman
W. Wayne Workman, M.D.
Drew Stacy Workman
Dane Christopher Workman
David Bush Workman

six family branches owned controlling stock in petitioner. The largest branch holding was approximately 31 percent, which was spread among the 20 members of the H. C. Bush family. However, the older members of each branch were either officers or directors of petitioner.

One such person, key to the instant case, is C. J. Ethier (C.J.). C.J., a member of the Bush family by marriage, was both a director and the president of petitioner during the years in question. He was required to know the day-to-day movements of the navy bean market. Well regarded for his knowledge in the area, C.J., along with employee Fred Hammand (Hammand), negotiated many of the navy bean acquisitions for petitioner.

Acquisition of navy beans for production was a relatively consistent process. If successful, the negotiations conducted by C.J. or Hammand with either Grant L. Kuhn Co., Michigan

SANFORD B. BUSH FAMILY
Wilma R. Bush
Karen Bush Everett
Karen Bush Everett, trustee of Sanford B. Bush Trust dated 12/28/65
James Andrew Everett III
Zenda & Co.

LENA MAYE BUSH ETHIER FAMILY
Lena Bush Ethier
C. J. Ethier
Camille E. Wheeler
James B. Ethier
C. J. Ethier and Lena Maye Ethier, trustees of May 10, 1971 Trust
C. J. Ethier and James B. Ethier, trustees
Ronnie L. Wheeler
Kathryn K. Ethier
James Bush Ethier, custodian for Kelly Ethier
James Bush Ethier, custodian for Kristin Ethier

FRANCES BUSH CLEVENGER FAMILY
Frances B. Clevenger
Carolyn C. Slagle
Don B. Clevenger
Carolyn C. Slagle, custodian for Lydia C. Slagle
Carolyn C. Slagle, custodian for J. Shell Slagle
Carolyn C. Slagle, custodian for Frances S. Slagle
Carolyn C. Slagle, custodian for Mark W. Slagle
Don and Wanda Clevenger, custodian for Tony M. Clevenger
Don and Wanda Clevenger, custodian for Randy D. Clevenger
Don and Wanda Clevenger, custodian for Donna Gay C. McGaha
Wanda T. Clevenger
C. J. Ethier and L. A. Thompson, trustees of the Frances Bush Clevenger Trust No. 1 of 2/19/76
C. J. Ethier and L. A. Thompson, trustees of the Frances Bush Clevenger Trust No. 2 of 2/19/76

Elevator Co., J. P. Burroughs Co., or Michigan Bean, would result in "open contracts" between petitioner and those suppliers. Petitioner made no distinction, at that time, between contracts for use as dividends and contracts for use in production. Although these "open contracts" specified quantity and quality and fixed the price as of the agreement date, they remained executory or "open" as to shipping date. This was accomplished by a designation such as "May/June/July" which would allow the seller to withhold shipment until the last day of the last month indicated (in this case July 31) or to begin delivery on the first day of the first month (May 1), unless the contract details provided otherwise. The buyer could usually demand shipment any time within the designated period or pay storage costs if the period had passed without shipment. Thus, the shipment date designation, not the date of the agreement, was the critical date of each contract. It was, therefore, theoretically possible for petitioner to obtain year-round deliveries of beans from simultaneous agreements by merely allocating shipment designations among the next 12 months.

Due to the uncertainty of production needs and the volatile nature of the price of navy beans, such theoretically possible year-round supplies were not necessarily desirable. Instead, there were two basic approaches to supply in the industry. One approach was to contract for beans for immediate delivery as production needs arose. Another approach was to contract for beans in large amounts, usually at lower prices, for shipment in the reasonably predictable future. This was referred to as maintaining a long position by forward buying. Petitioner chose this latter approach. In other words, during periods of low prices, petitioner would accumulate sufficient open contracts to meet predicted production needs, thus avoiding the possibility of higher prices during the coming period, yet would preserve its ability to take advantage of any potential for lower prices by not contracting for deliveries too far into the future.

The risk of maintaining an excessively long position was increased by the absence of an organized commodity market for navy beans. Without such a market, petitioner could not be assured a buyer, at any price, for navy beans which, although under contract to petitioner, were in excess of production needs as of the shipment date. Although a rarity, buyers would from time to time withdraw from the market, refusing to purchase

navy beans at any price. During these times, all trading would cease.

After sufficient open contracts for a particular period were committed, petitioner, through C.J., would select the order of contract shipment. This order did not necessarily follow the chronology of the respective agreements. Instead, C.J. would select contracts for shipment relative to the shipment designations and a number of other business reasons. Thus, petitioner would take first delivery of those contracts with high prices or storage costs, coordinate delivery of certain contracts with the geographic availability of transportation, and arrange shipments in cooperation with overstocked or understocked suppliers.

Upon shipment, the navy beans were invoiced to petitioner and, once accepted, were entered into petitioner's purchases account 510, which, at the end of the fiscal year, would be closed into the perpetual inventory of navy beans. Invoices and receiving reports were kept by truckload, since partial contracts could be shipped. Each truckload was then valued in accordance with the selected open contract with the respective supplier. The perpetual inventory was, in turn, valued in accordance with these figures, under an assumption of first-in, first-out (Fifo), since specific identification of the commingled mass of fungible navy beans for production use was impractical. Therefore, the ending inventory quantity was valued at the cost of the most recently received beans, proceeding in reverse chronological order until the entire quantity had been valued. Periodic measurements of actual inventory were made, accompanied by quantity adjustments to the perpetual inventory record, as needed. However, these measurements did not necessarily take place at the end of each fiscal year.

From time to time, petitioner would also select and pay for certain open contracts, not for delivery and production, but for distribution as dividends in kind. In all, nine such dividends were made during the period of October 1970 through March 1976. Pertinent facts of the five in issue here are set forth below:

| Dividend Number | Declaration date | Distribution date | Cost per hundred weight (CWT) | Fair market value reported | Sales dates[1] | Sales prices |
|---|---|---|---|---|---|---|
| 1 | 4/20/71 | 6/15/71 | $7.45 | $14.75 | 6/21—8/9/71 | $15.10—$16.25 |
| 2 | 2/16/72 | 3/15/72 | 11.25 | 14.00 | 3/15/72 | 14.00 |
| 3 | 5/16/73 | 6/15/73 | 9.35 | 19.50 | 6/15/73 | 19.50 |
| 4 | 6/14/73 | 6/25/73 | 9.35 | 19.50 | 6/25—6/26/73 | 19.50 |
| 5 | 11/14/73 | 11/16/73 | 10.25 | 40.00 | 11/19—12/14/73 | 40.00—43.00 |

[1]In this schedule and hereafter, "Sales Dates" refers to the dates of certain phone calls by the shareholders or their representatives to Michigan Bean. During those phone calls, every material

detail of the sale, including the quantities and prices of the beans being sold to Michigan Bean, was finally and completely agreed upon. The assignments by the shareholders and the confirmations and the issuance of the payment checks by Michigan Bean on the same day or within a few days of the telephone calls, were mere formalities carrying out the agreed-upon sales. Since the beans were already in the possession of Michigan Bean, delivery was not necessary.

Although some differences existed, all of the dividends in issue were of navy beans from Michigan Bean and followed the same general pattern. Recommendation for a dividend in kind came from C.J. His reasons were always related to the natural hazard of open contracts in excess of production demands, experienced whenever using a forward buying policy to meet unpredictable demand. The specific cause of the excess was unexplained for dividends No. 1 and No. 4, was blamed on low pork and bean sales for No. 2 and No. 3, and was related to production slowdowns due to fuel and tomato paste shortages prior to No. 5. Regardless of the reason given for the excess, the record shows that each recommendation of C.J. for a dividend in kind from excess open contracts was unquestioned, resulting in an immediate, unanimous declaration of dividend by the board of directors.

Upon declaration of the dividend, payment checks and a list of shareholder-names were sent to Michigan Bean. In return, Michigan Bean issued a warehouse receipt to petitioner. The beans remained in Michigan Bean's elevators. Thus, shareholders were not physically given navy beans. Instead, bills of sale for appropriate amounts of beans were distributed. Each bill of sale conveniently contained a preprinted assignment clause by which each shareholder could assign his bean dividend merely by filling in the assignee name and then signing the assignment. It appeared as follows:

### ASSIGNMENT

For value received the undersigned hereby sells, assigns, transfers and conveys to _____ all of the undersigned's right, title and interest in or to the above attached Bill of Sale and does hereby irrevocably constitute and appoint Michigan Bean Division to make delivery of said beans described therein to such assignee.

_____ (stockholder)

Although a simple document, the assignment clause was not always completed properly with the purchaser's name. However, since the shareholders observed the customary courtesy of allowing the supplier an informal right of first refusal, the beans were invariably sold back to Michigan Bean. Therefore, the

blank spaces in the assignments caused no confusion in the implementation of the transaction.

Having been sold and then repurchased in a rapid sequence of events, the beans were never physically moved during this period. Yet, these same beans were always sold at a price higher than the original open contract price and, with the exception of No. 1 and No. 5, the entire transaction from distribution to sale was completed in only 1 day. While the assignment clauses were executed individually, contact with Michigan Bean for the sale details was made through phone calls by the elder members of the respective family branches. In this way, these "family leaders," most of whom were also officers or directors of petitioner, could make single calls for a number of shareholders. Although some time may have been saved by such group calls, no record of prior negotiations between the shareholders and Michigan Bean was provided to explain how even these transactions could have all been completed in 1 day. Further, both the fact that petitioner was even engaged in the sale of raw navy beans, and the existence of dividend-related negotiations between petitioner and Michigan Bean were categorically denied. However, Michigan Bean sent sales confirmations for dividends No. 1 and No. 2 to petitioner, but sent them to the individual shareholders for dividends No. 3, No. 4, and No. 5, at the request of C.J.

Since the distributed navy beans were not delivered to petitioner, they were never entered into petitioner's inventory records, with the exception of No. 1.[3] Thus, the cost of the contracts used as dividends, usually selected from older contracts, was specifically identified to the dividend and not included in petitioner's Fifo inventory system. Meanwhile, navy beans selected and received for production during the week following a dividend in kind were entered into petitioner's

---

[3]Dividend No. 1 was declared Apr. 20, 1971, within FYE Apr. 30, 1971, but was not to be distributed until June 15, 1971, within the next fiscal year. Upon paying for the beans, petitioner entered the amount in the purchases account, offsetting a similar amount in cash and between the retained earnings account and a dividend payable account. Due to the intervening fiscal yearend, the usual reversing entries upon distribution of the dividend were not made between the purchases and dividend payable accounts in FYE Apr. 30, 1971. Instead, ending inventory for 1971 and, thus, beginning inventory for 1972, were increased by the amount of the dividend. Therefore, the additional amount in purchases for 1971 was offset by the larger ending inventory for 1971, and the larger beginning inventory for 1972 was offset by the smaller purchases amount for 1972, having been reduced by the reversing entry to the dividends payable account during 1972. The result in both years, then, was that the cost of goods sold was unaffected by these entries.

432

inventory records at costs substantially higher than those of the distributed navy beans.[4]

Selection of open contracts for use as dividends in kind was also made by C.J. for petitioner. Usual factors weighed by C.J. were the overstocked position of petitioner as to a particular delivery time, impending storage costs on certain overdue contracts, and the amount of beans necessary to fulfill the desired dividend. The fewer contracts used, the better. Use of these criteria can be seen by reviewing dividends No. 1 through No. 4.[5] Dividend No. 1 was satisfied by a contract 7 months

---

[4]Approximately 84 percent of the beans entered into petitioner's inventory in the week following each dividend in kind in issue here cost more than the beans chosen for the respective dividends. Such inventoried costs were from 12- to 270-percent higher than the dividended costs. More specifically, a comparison of the high and low inventoried costs for each week following a dividend in kind with the cost of the respective dividend in kind shows higher inventoried costs of 32 percent for June 15, 1971; 12 to 30 percent for Mar. 15, 1972; 20 to 114 percent for June 15, 1973; and 216 to 270 percent for Nov. 16, 1973. The cost of the few beans inventoried during the week following the June 25, 1973, dividend in kind was below the cost of the dividended beans.

[5]

OPEN SALES BUSH BROS. 6/15/71

| Contract date | Contract number | Number CWT | Contract price | Contract value | Shipment designation |
|---|---|---|---|---|---|
| 5/6/71 | SF 30228 | 621sx | $14.50 | $9,004.50 | May |
| 5/26/71 | SF 30265 | 4650sx | 14.50 | 67,425.00 | June |
| 6/8/71 | SF 30283 | 5000sx | 14.50 | 72,500.00 | July |

DIVIDEND IN KIND 6/15/71

| | | | | | |
|---|---|---|---|---|---|
| 6/15/70 | SF 29219 | 10000sx | 7.45 | 74,500.00 | Sept./Oct. 1970 |
| | dividend | 6870.9 | | 51,188.21 | |

OPEN SALES BUSH BROS. 3/15/72

| | | | | | |
|---|---|---|---|---|---|
| 2/23/72 | SF 31128 | 2212sx | 14.25 | 31,521.00 | March |

DIVIDEND IN KIND 3/15/72

| | | | | | |
|---|---|---|---|---|---|
| 9/8/71 | SF 30531 | 5000sx | 11.25 | 56,250.00 | Oct./Nov. 1971 |
| | dividend | 4497.34 | | 50,595.08 | |

OPEN SALES BUSH BROS. 6/15/73

| | | | | | |
|---|---|---|---|---|---|
| 6/08/73 | SF 32732 | 6770sx | 20.00 | 135,400.00 | June/July |
| 6/13/73 | SF 32743 | 5000sx | 20.00 | 100,000.00 | June/July |
| 3/29/73 | SF 32499 | 5000sx | 10.25 | 51,250.00 | Sept./Oct./Nov. |
| 4/4/73 | SF 32535 | 5000sx | 10.25 | 51,250.00 | Sept./Oct./Nov. |

DIVIDENDS IN KIND 6/15/73—6/25/73

| | | | | | |
|---|---|---|---|---|---|
| 3/2/73 | SF 32408 | 25000sx | 9.35 | 233,750.00 | March/April |
| 6/15 | dividend | 12814.7 | | 119,817.45 | |
| 6/25 | dividend | 12176.91 | | 113,854.11 | |

OPEN SALES BUSH BROS. 11/16/73

| | | | | | |
|---|---|---|---|---|---|
| 9/04/73 | SF 32872 | 9857sx | 22.00 | 216,854.00 | Sept. |
| 9/06/73 | SF 32880 | 10000sx | 22.00 | 220,000.00 | Sept./Oct. |

overdue, No. 2 by a contract 3 months overdue, and both No. 3 and No. 4 by a single contract almost 2 months overdue. However, No. 5 was satisfied by three contracts, none of which were overdue, when two available contracts, although costing more, were both overdue and closer to the dividend amount of beans. The reasoning behind the contract selection for No. 5 was not revealed.

Relative to the above facts, respondent contends that the sale of dividends should be imputed to petitioner, which knew and expected immediate sale of the navy beans, merely using the dividends in kind as tax avoidance devices. In the alternative, respondent contends that the distributions were anticipatory assignments of income correctly chargeable to petitioner. Further, respondent contends that if we find the distributions to be proper dividends, then the valuation of those dividends was improper and inconsistent with petitioner's inventory methods.

To the contrary, petitioner contends that the sales are not imputable, but instead were conducted by the shareholders of their own choice and negotiation, without any aid or influence of petitioner. Neither does petitioner agree that the distributions were assignments of income, claiming instead that they were transfers of appreciated capital assets. Finally, petitioner claims that the navy beans distributed were acquired for distribution and not production and were thus properly excluded from the Fifo inventory system. Should petitioner fail on any of the above points, it further claims that any determination with respect to dividend No. 1 is barred by the statute of limitations of section 6501(a), since it was declared in FYE April 30, 1971, and thus, under Tennessee law, was merely a debt paid in the next year.

| 9/10/73 | SF 32896 | 1355sx | 23.50 | 31,842.00 | Sept./Oct. |
| 9/12/73 | SF 32914 | 5000sx | 23.50 | 117,500.00 | Sept./Oct. |
| 10/9/73 | SF 33027 | 2010sx | 34.50 | 69,345.00 | --- |
| 11/12/73 | SF 33168 | 10000sx | 10.25 | 102,500.00 | Sept./Oct./Nov. |
| 9/18/73 | SF 32963 | 10000sx | 10.80 | 108,000.00 | Sept./Oct./Nov. |
| 9/18/73 | SF 32962 | 10000sx | 11.69 | 116,900.00 | Sept./Oct./Nov. |
| 9/15/73 | SF 32964 | 10000sx | 10.55 | 105,500.00 | Sept./Oct./Nov. |

DIVIDEND IN KIND 11/16/73

| 3/29/73 | SF 32499 | 5000sx | 10.25 | 51,250.00 | Sept./Oct./Nov. |
| 4/4/73 | SF 32535 | 5000sx | | 51,250.00 | Sept./Oct./Nov. |
| 11/12/73 | SF 33168 | 10000sx | | 102,500.00 | Sept./Oct./Nov. |
| | dividend | 19228.19 | | 197,088.95 | |

OPINION

Section 311(a) provides that, except for certain situations not relevant here, "no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of * * * property." This section clearly allows dividends in kind of appreciated property without taxable gain to the distributing corporation. However, its enactment was not intended to invalidate the case law following *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), and *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950), which would impute income to ongoing corporations[6] avoiding taxes by making sham dividends to disguise sales of the distributed property. *Waltham Netoco Theatres, Inc. v. Commissioner*, 49 T.C. 399, 404 (1968), affd. 401 F.2d 333 (1st Cir. 1968); *A.B.C.D. Lands, Inc. v. Commissioner*, 41 T.C. 840, 847, 852 (1964). Therefore, the *Court Holding/Cumberland* line of cases remains applicable to review activities technically within section 311(a). While a taxpayer has a right to reduce his taxes by any legally available means, the steps taken to reduce those taxes must be among those intended by the statute allowing the tax avoidance. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

Initially, the decision of whether or not to impute income from the sale of dividends in kind to the distributing corporation was premised upon the participation of that corporation in the sale negotiations. *Commissioner v. Court Holding Co., supra; United States v. Cumberland Public Service Co., supra.* In *United States v. Lynch*, 192 F.2d 718 (9th Cir. 1951), cert. denied 343 U.S. 934 (1952), the Ninth Circuit expanded what constituted decisive participation in the sale to include use of the corporate marketing facilities by the shareholders to implement the sale. The absence of sale negotiations by the corporation in *Lynch* was not persuasive because a ready market existed for the distributed property. This position was followed by this Court and expanded in *A.B.C.D. Lands, Inc. v. Commissioner, supra* at 848, where we found that, even in the absence of corporate participation in the sale, income could be imputed to the distributing corporation if

---

[6]As noted in dicta by the Sixth Circuit in *Central Tablet Manufacturing Co. v. United States*, 481 F.2d 954, 959 (1973), corporations preparing for liquidation were given relief from the *Court Holding/Cumberland* line of cases through the enactment, by Congress, of sec. 337, which is not applicable in the instant case.

no business purpose existed and if the distributed property was known or expected to be immediately sold.[7] Cf. *United States v. Lynch, supra* at 720; *Commissioner v. Transport Trading & Terminal Corp.*, 176 F.2d 570, 572 (2d Cir. 1949), cert. denied 338 U.S. 955 (1950).

While contentions that the presence of a tax-avoidance motive should conclusively impute income from a dividend in kind to a corporation have been rejected in the past,[8] the presence of such a motive will subject a transaction to intensive scrutiny. *A.B.C.D. Lands, Inc. v. Commissioner, supra* at 848. Further, should a close examination reveal that tax avoidance was the primary motive behind a pattern of conduct directed by the corporation, then, even in the presence of a business purpose, the income will be charged to the corporation. *United States v. Lynch, supra* at 720; accord, *Southern Bancorporation v. Commissioner*, 67 T.C. 1022, 1027 (1977). It is just such a pattern of conduct which proves fatal to petitioner's case.

Although petitioner is not a closely held corporation, it is a family corporation with similar control characteristics. While the number of shareholders is over 50, the shareholder group is composed of 6 interrelated families, each with its own leader or leaders who are entrusted with the management of the corporation. These leaders are followed by their respective families in matters of shareholder action, as well. Therefore, both internal and external control of petitioner, sufficient to first create a dividend and then dispose of it, is actually in the hands of this small group of family leaders. *Commissioner v. Transport Trading & Terminal Corp., supra* at 572.

Because of this concentration of control, whether or not certain acts were done by the leaders in their capacity as officers or by them in their capacity as shareholders will not work to negate the involvement of petitioner. Holding such control, the family leaders were more than mere agents. Hence, actions taken in their separate roles may not be separately considered.

---

[7]Assigning importance to the presence of a business purpose, to an expectation of immediate sale or to a tax-avoidance motive has been rejected by the Fifth Circuit which decided a similar case solely on whether the ongoing corporation participated in the sale. *Hines v. United States*, 477 F.2d 1063 (5th Cir. 1973). However, appeal in the instant case would be to the Sixth Circuit, which has not decided the proper weight to be given these factors relative to an ongoing corporation. Therefore, the *Hines* approach is not controlling here. *Hughes v. Commissioner*, 65 T.C. 566, 569 (1975).

[8]See *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950); *Hines v. United States, supra; United States v. Cummins Distilleries Corp.*, 166 F.2d 17 (6th Cir. 1948).

But cf. *Ripy Brothers Distillers, Inc. v. Commissioner*, 11 T.C. 326, 340 (1948). Confusion of the petitioner and the shareholder group, which evinces the external impression of the involvement of petitioner through the family leaders, is difficult to deny. Even Michigan Bean, which was directly involved in the transactions, sent the first sales confirmations directly to petitioner. Only at the specific request of C.J. did Michigan Bean begin to send separate sales confirmations to each individual shareholder.

Specifically, in the matter of dividends in kind, control was pinpointed on C.J. Without any recorded discussion, much less disagreement, unanimous approval was always given by the board of directors to suggestions of a dividend in kind made by C.J. Upon distribution of the beans, the other shareholders looked to the family leaders for help and guidance in disposing of the beans. All of the family leaders, especially C.J., were either knowledgeable of the market place or privy to such knowledge. They were thus fully aware, when they declared the dividends in kind, that the shareholders, themselves included, would sell the distributed beans. *United States v. Lynch, supra* at 720; cf. *Commissioner v. Transport Trading & Terminal Corp., supra* at 572. This expectation of rapid sale is exemplified by the fact that each of the bills of sale distributed to the shareholders contained a preprinted transfer clause, ready for simple completion.

The fact that petitioner was not directly involved in any sale negotiations is not conclusive here. In *Lynch*, the presence of such negotiations was not necessary because a ready market existed for the distributed property. Although no established market existed here, the need to find presence of such negotiations is similarly nonexistent due to an informal understanding with Michigan Bean. This understanding insured, not only that Michigan Bean had a right of first refusal to the beans which it held, but also that Michigan Bean would be first in line as buyer of the beans. Due to this understanding, formal participation by petitioner in the sale negotiations was just as unnecessary as in the *Lynch* situation. Yet, even without formal intervention by petitioner, the vast majority of bean sales by the shareholders took place on the same day as the distribution of the bean dividend. At times, the transfer was so rapid that the preprinted transfer clause was not properly completed. Nevertheless,

Michigan Bean was known to be the transferee. Therefore, the lack of negotiations was not a detriment and certainly does not prevent any finding of involvement by petitioner. *United States v. Lynch, supra* at 720–721; *A.B.C.D. Lands, Inc. v. Commissioner, supra* at 848. Further, this understanding with Michigan Bean facilitated such easily completed sales, that the overall risk experienced by the shareholders, in the short time they held their beans, was relatively low and not worthy of independent significance. But cf. *United States v. Cummins Distilleries Corp.*, 166 F.2d 17, 21 (6th Cir. 1948).

Heightening the effect of these various factors, is the increasing frequency of dividends in kind during the period examined here. For instance, during the 30-month period of June 1971 to November 1973, five dividends in kind were distributed. Three of those occurred in the final 6 months; two within the same month. Petitioner claims to have used dividends in kind for the business purpose of reducing its excess supply of beans. However, we find it incredible that petitioner, in business for almost 80 years, would have miscalculated its needs so often and with increasing frequency as time passed. Further, more beans were purchased soon after each such dividend. Surely petitioner would not have purchased more beans while being overstocked. Therefore, we believe that petitioner was attracted to the use of dividends in kind primarily as a tax-avoidance device and not for any substantive business purpose. *United States v. Lynch, supra* at 720; accord, *Southern Bancorporation v. Commissioner, supra* at 1027.

Motivated primarily by tax avoidance and without any substantial business purpose, petitioner, through its officers and directors planned and carried out dividends in kind which it expected to be immediately sold. Then, indirectly, petitioner greatly influenced the sale of those dividends leaving little or no option upon which the shareholders could exercise their independent judgment. These activities are not among those intended by section 311(a). Cf. *Gregory v. Helvering, supra* at 469. Therefore, the income will be imputed to petitioner. *United States v. Lynch, supra; A.B.C.D. Lands, Inc. v. Commissioner, supra;* accord, *Southern Bancorporation v. Commissioner, supra.*

Having found for respondent on the first issue, it is unnecessary for us to deal with the issues of assignment of income or proper accounting methods. However, we must decide whether

the income from dividend No. 1, which was declared April 20, 1971, but not distributed until June 15, 1971, is to be imputed to petitioner, or whether respondent's determination relative to dividend No. 1 is barred by section 6501(a).

Petitioner argues that since dividend No. 1 was declared on April 20, 1971, within FYE April 30, 1971, the income should be imputed to petitioner, if at all, for that year. It then follows, says petitioner, that any assessment relative to FYE April 30, 1971, is barred by the limitation of section 6501(a). Respondent neither denies that FYE April 30, 1971, is barred, nor claims explicitly that the FYE April 30, 1972, is validly within the scope of the notice of deficiency mailed November 4, 1975. Instead, respondent contends only that the income should be imputed to petitioner for FYE April 30, 1972, since dividend No. 1 was distributed in that year.

Citing *Commissioner v. Goldwyn*, 175 F.2d 641 (9th Cir. 1949), petitioner contends that the declaration of dividend No. 1, which created a debtor-creditor relationship between petitioner and the shareholder group in FYE April 30, 1971, was the event which triggered tax liability of petitioner for dividend No. 1. In the instant case, however, we are faced, not with the effect of the declaration of a dividend on earnings and profits as in *Goldwyn*, but with the timing of the income attributable to dividend No. 1 to be imputed to petitioner. Therefore, our perspective must differ from that urged by petitioner. Cf. *Goldwyn v. Commissioner*, 9 T.C. 510, 515–516 (1947), affd. 175 F.2d 641 (9th Cir. 1949); see also *Proctor v. Commissioner*, 11 B.T.A. 235, 239 (1928).

Under section 1.301–1(b), Income Tax Regs., a dividend "shall be included in the gross income of the distributees when the cash or other property is unqualifiedly made subject to their demands."[9] This issue is factual. *Avery v. Commissioner*, 292 U.S. 210 (1934). Its determination is based upon three tests: (1) Shareholder's unrestricted, legal right to demand payment at any time,[10] (2) no agreement involving shareholders to defer

---

[9] Accord, *Bingham v. Commissioner*, 8 B.T.A. 603 (1927); *Proctor v. Commissioner*, 11 B.T.A. 235, 239 (1928); *Braunstein v. Commissioner*, 16 B.T.A. 1330 (1929).

[10] *Saenger, Inc. v. Commissioner*, 33 B.T.A. 135, 143, affd. 84 F.2d 23 (5th Cir. 1936), cert. denied 299 U.S. 577 (1936); *Valley Lumber Co. of Lodi v. Commissioner*, 43 B.T.A. 423, 426 (1941); cf. sec. 1.451–2(a), Income Tax Regs.

payment[11] and, (3) the ability of the corporation to fulfill the dividend.[12] While petitioner was capable of distributing the dividend, the control of the shareholder group over the dividend was minimal. Payment date of dividend No. 1 was established by a resolution of the board of directors as June 15, 1971. The shareholders had no right to demand distribution prior to that date. Further, this date was not a deferral, by an agreement with the shareholder group, of a dividend to which the shareholder group earlier had rights. Thus, we cannot see how the shareholders can be said to have had an unqualified right to dividend No. 1 prior to June 15, 1971. Therefore, the income from dividend No. 1 arose in FYE April 30, 1972, and will be imputed to petitioner in that year.

*Decision will be entered for the respondent.*

Reviewed by the Court.

QUEALY, *J.*, dissents.

TANNENWALD, *J.*, concurring: I agree with the result reached by the majority, but I am concerned that the majority opinion may be read as adopting a rationale that distribution by an ongoing corporation of appreciated property as a dividend in kind coupled with the primary purpose of avoiding tax on the appreciation and the absence of substantial business purpose is, without more, sufficient to impute the subsequent sale of the property to the corporation. It may well be that such a rationale would be salutary, but the equating of purpose of distribution with fact of sale flies in the face of the distinction drawn by the Supreme Court in *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), and *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950). I do not regard the reference to "profits of a going concern" in *Cumberland* as indicating that, in the case of ongoing corporations, it is unnecessary to determine that the

---

[11]*Bouligny, Inc. v. Commissioner*, 45 B.T.A. 456, 460 (1941); *Valley Tractor & Equipment Co. v. Commissioner*, 42 B.T.A. 311, 315 (1940).

[12]*Baker v. United States*, 84 Ct. Cl. 428, 17 F. Supp. 976, 979–980 (1937); *Saenger, Inc. v. Commissioner*, 84 F.2d 23, 25 (5th Cir. 1936), affg. 33 B.T.A. 135 (1935), cert. denied 299 U.S. 577 (1936).

sale by the shareholders was in fact made by the corporation. Respondent's own regulations (see sec. 1.311–1(a), Income Tax Regs.) set that standard and make no distinctions based upon the status of the distributing corporation.

If distribution and purpose are, per se, enough to impute a shareholder sale to the corporation, such elements as expectation of shareholder sale, the lapse of time between the distribution and such sale, and the character of the assets involved become irrelevant. See *Waltham Netoco Theatres, Inc. v. Commissioner*, 49 T.C. 399, 405–406 (1968), affd. 401 F.2d 333 (1st Cir. 1968).

Judge Goldberg, in speaking for a unanimous panel of the Fifth Circuit Court of Appeals in *Hines v. United States*, 477 F.2d 1063 (5th Cir. 1973), stated at pages 1069–1070:

We hold that the *sine qua non* of the imputed income rule is a finding that the corporation actively participated in the transaction that produced the income to be imputed. Only if the corporation in fact participated in the sale transaction, by negotiation, prior agreement, postdistribution activities, or *participated* in any other significant manner, could the corporation be charged with earning the income sought to be taxed. Any other result would unfairly charge the corporation with tax liability for a transaction in which it had no involvement or control.

It may well be that a somewhat less strict standard of participation by the distributing corporation than that which the Fifth Circuit seems to have adopted should be applied. However, on the facts herein, I believe that petitioner participated sufficiently in the sales that the profits therefrom should be imputed to it.

FEATHERSTON, FAY, DAWSON, SIMPSON, and IRWIN, *JJ.*, agree with this concurring opinion.

CHABOT, *J.*, dissenting: Petitioner distributed property to its shareholders. The shareholders, more-or-less promptly, sold the property.[1] The majority do not find that petitioner sold the property, yet the majority hold that the gains on the sales are to be imputed to petitioner. From this holding I respectfully dissent.

The majority rely on *United States v. Lynch*, 192 F.2d 718 (9th Cir. 1951), in imputing the gains to petitioner. In *Lynch*, the corporation had physical possession of the apples assertedly distributed to its shareholders (192 F.2d at 719); the apples were

---

[1]Dividend 1 was sold within 8 weeks after the distribution; dividends 2, 3, and 4 were each sold on the same day as the distribution; dividend 5 was sold within 4 weeks after the distribution.

part of the corporation's inventory (192 F.2d at 720); "the sale was to be made by utilizing the corporation's facilities in the ordinary course of its business" (192 F.2d at 720); and the corporation did not charge its "customers" (i.e., the shareholders) a selling commission and certain customary handling charges were not imposed (192 F.2d at 721). In the instant case, in contrast, petitioner did not have physical possession of the distributed navy beans. Petitioner distributed to its shareholders the warehouse receipts evidencing the right to the distributed beans. Petitioner's selling facilities and personnel were not used to arrange for or to execute the sales of the distributed beans or warehouse receipts.

In the foregoing important elements, the instant case differs from that dealt with in *Lynch*. A holding for petitioner herein may conflict with some of the sweeping language in the Court of Appeals' opinion in *Lynch*, but it would be entirely compatible with what the Court of Appeals did in that case and with the Court of Appeals' evaluation of the facts it faced in that case. See *Peter Pan Seafoods, Inc. v. United States*, 417 F.2d 670, 674 (9th Cir. 1969); *United States v. Horschel*, 205 F.2d 646, 650 (9th Cir. 1953).

The majority herein dismiss the opinion of the Court of Appeals for the Fifth Circuit in *Hines v. United States*, 477 F.2d 1063 (1973). The only stated ground for so doing is that the *Hines* approach is not controlling here because appeal in the instant case would be to the Sixth Circuit, and not to the Fifth Circuit. In *Hines*, too, some of the sweeping language of the opinion may go beyond the Court of Appeals' analysis of the facts it faced. Nevertheless, a decision for petitioner herein would be consistent with what the Court of Appeals did in *Hines*.

The majority do not hold that there has been an anticipatory assignment of income. Rather, they conclude that petitioner should be taxable on the gains because the distributions proceeded from tax-avoidance motives and without any substantial business purpose. However, taxpayers may so arrange their affairs that their taxes may be as low as possible (*Gregory v. Helvering*, 293 U.S. 465 (1935)), and what they did, rather than what they might have done, controls their liability. *Seminole Flavor Co. v. Commissioner*, 4 T.C. 1215, 1235 (1945); *Koppers Co. v. Commissioner*, 2 T.C. 152, 158 (1943). The petitioner herein

chose to make distributions of dividends in kind rather than sell the appreciated property and retain the proceeds or distribute the proceeds. This petitioner may do so in the exercise of its business judgment and in accordance with the wishes of its shareholders, even if the sole purpose of distributing in kind rather than distributing cash is to lessen petitioner's taxes.[2]

The law penalizes corporations that refuse to issue dividends in order to avoid tax on their shareholders. Petitioner herein is, in effect, penalized because it issued dividends which increased its shareholders' incomes subject to tax.

It is sometimes charged that corporations are used to pass through artificial losses in order to reduce their shareholders' Federal income tax liabilities. In the instant case, the set of transactions increased petitioner's shareholders' incomes subject to tax.

Concerns are expressed about so-called "tax-free" dividends, which enable shareholders to receive funds from their corporations without having to take these funds into income. We have no indication that a decision for petitioner in the instant case would result in such "tax-free" dividends.

Cases arise which involve the asserted use of a corporate form to divert income from the true owners of a business to those owners' children or other low-tax-bracket family members. No such tax avoidance is charged here.

Nothing in the legislature's command,[3] the actions of the Courts of Appeals cited by the majority herein,[4] or this Court's precedents[5] justifies taxing to petitioner the gains realized by petitioner's shareholders.

STERRETT, HALL, and NIMS, *JJ.*, agree with this dissenting opinion.

---

[2]See *San Diego Transit-Mixed Concrete Co. v. Commissioner*, T.C. Memo. 1962–141.

[3]See *United States v. Rutherford*, 442 U.S. 544 (1979), where the Supreme Court, in a different context, noted that "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy."

[4]See T. David, "The Imputed Sale and Anticipatory Assignment of Income Doctrines: Their Effect on IRC §§ 311 & 336," 15 Buffalo L. Rev. 154, 158–159 (1965).

[5]See *Rogers v. Commissioner*, 38 T.C. 785 (1962), where we held that a donor of an interest in standing timber that he contributed to a charitable organization is not taxable on the gain from the sale of contributed timber even though (1) it was understood at the time of the contribution that the timber was to be sold, (2) the timber remained on the donor's land until the timber was sold, and (3) the donor did substantially all the work in selling the timber.

NIMS, *J.*, dissenting: I agree with what is said by Judge Chabot in his dissenting opinion, to which I wish to add the following few words: The Court, in effect, is now taking the final step long ago portended by the Second Circuit's opinion in *Commissioner v. Transport Trading & Terminal Corp.*, 176 F.2d 570 (2d Cir. 1949), cert. denied 338 U.S. 955 (1950). This eventuality has been suggested by two leading commentators in the following words:

The court in the *Lynch* case relied heavily on CIR v. Transport Trading & Terminal Corp., where the Court of Appeals for the Second Circuit indicated that it might go so far as to attribute the profit on a sale to the corporation, even if there had been no corporate negotiations or use of corporate selling facilities and even if noninventory property was involved, merely because the distribution served no nontax function and was made in the expectation that the distributee would sell the distributed property immediately after receiving it. [Fn. refs. omitted.][1]

In my opinion, we are now imposing *Court Holding Co.*-like[2] consequences upon a transaction where such draconian action is wholly unjustified by the facts or the perceived tax mischief sought to be remedied.

STERRETT, HALL, and CHABOT, *JJ.*, agree with this dissenting opinion.

---

[1]B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.21, p. 7–56 (4th ed. 1979).

[2]*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945).